# PD-1258-15

PD-1258-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/28/2015 8:11:42 AM
Accepted 11/2/2015 10:53:56 AM
ABEL ACOSTA
CLERK

PD-1258-15

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

_____

ROGELIO AVILES-BARROSO,
Petitioner
v.
STATE OF TEXAS

_____

Petition in Cause No. 1364839 from the
337th District Court of Harris County, Texas and

The Court of Appeals for the Fourteenth
Judicial District of Texas
No. 14-14-00142-CR

_____

PETITION FOR DISCRETIONARY REVIEW

_____

GERALD E. BOURQUE
24 Waterway Avenue, Ste 660
The Woodlands, Texas 77380
(713) 862-7766
Bar Card No. 02716500
Gerald@geraldebourque.com
Attorney for Petitioner
Rogelio Aviles-Barroso
October 28, 2015

FILED IN
COURT OF CRIMINAL APPEALS

November 2, 2015

ABEL ACOSTA, CLERK

## Identity of Judge, Parties, and Counsel

Trial Judge:             Judge Renee Magee

Appellant:               Rogelio Aviles-Barroso

Trial Counsel:           Charlie Brown, 708 Main Street, Ste 790, Houston, TX, 77002

Appellate Counsel:       Gerald E. Bourque, 24 Waterway Ave., Ste 660, The Woodlands, TX, 77380

Appellee:                State of Texas

Trial Counsel:           Natalie Tise, Harris Cty Dist. Atty, 1201 Franklin Ave., Houston, TX 77002

Appellate Counsel:       Appellate Division, Harris Cty Dist. Atty, 1201 Franklin Ave., Houston, TX 77002

i

## **Table of Contents**

Identity of Judge, Parties, and Counsel..........................................................i

Table of Contents ...............................................................................ii

Index of Authorities............................................................................iii

Statement Regarding Oral Argument............................................................v

Statement of the Case.............................................................................v

Statement of Procedural History.................................................................v

Grounds for Granting Review ...................................................................vi

Argument..........................................................................................1

    *Background............................................................................... 1*

*Mr. Barroso's argument to the Fourteenth Court of Appeals regarding the question for this Court's review ..................................................................... 3*

    *Fourteenth Court Response.................................................................. 4*

*An impermissibly suggestive pre-trial voice identification procedure violates a defendant's Federal and State constitutional right to due process of law........................................................................................... 5*

*The use of a single, Puerto Rican voice played twenty years after the offense unduly suggested to Garcia that Mr. Barroso's voice belonged to the unknown perpetrator*............................................................................ 6

*"Showup" identification corrupts reliability*........................................... 9

*Erroneous reliability finding and factors that lack a scientific basis*........ 9

*The failure of the Biggers factors as applied to Mr. Barroso's case*....... 10

Prayer for Relief.......................................................................................18

Certificate of Compliance .......................................................................19

Certificate of Service...............................................................................20

## Index of Authorities

**Page(s)**

**Cases**

*Barley v. State*,
   906 S.W.2d 27 (Tex. Crim. App. 1995).........................................................6

*Brodes v. State*,
   614 S.E.2d 766 (Ga. 2005) ...................................................................... 10

*Delk v. State*,
   855 S.W.2d 700 (Tex. Crim. App. 1993).........................................................6

*Ibarra v. State*,
   11 S.W.3d 189 (Tex. Crim. App. 1999).........................................................9

*Madden v. State*,
   799 S.W.2d 683 (Tex. Crim. App. 1990).........................................................6

iii

*Neil v. Biggers*,
    409 U.S. 188 (1972) ........................................................ 6, 9, 10, 11, 14, 16, 17

*Simmons v. United States*,
    390 U.S. 377 (1968) ...........................................................................................6

*State v. Henderson*,
    208 N.J . 208 (2011)..................................................................................... 10, 13

*State v. Hunt*,
    69 P.3d 571 (Kan. 2003)...................................................................................10

*State v. Ramirez*,
    817 P.2d 774 (Utah 1991)..................................................................................10

*Stovall v. Denno*,
    388 U.S. 293 (1967) ........................................................................................5, 6

## Other Authorities

Cindy E. Laub et al., *Can the Courts Tell an Ear From an Eye? Legal
    Approaches to Voice Identification Evidence*, 37 Law & Psychol.
    Rev. 119, 123 (2013) .......................................................................................12

Daniel Read & Fergus I.M. Craik, E*arwitness Identification: Some
    Influences on Voice Recognition* .....................................................................14

Jose H. Kerstholt, *Earwitnesses: Effects of Accent, Retention, and
    Telephone*.................................................................................................... 13-15

Joseph Dunsmoor, Vishnu Murty, Lila Davachi, & Elizabeth Phelps,
    *Emotional Learning Selectively and Retroactively Strengthens
    Memories for Related Events* ...........................................................................16

Kenneth A. Deffenbacher et al., *A Meta–Analytic Review of the
    Effects of High Stress on Eyewitness Memory,* 28 *Law & Hum.
    Behav.* 687, 687, 699 (2004) ...........................................................................13

Kenneth Deffenbacher, *Relevance of Voice Identification Research to
    Criteria for Evaluating Reliability of an Identification*....................................12

iv

Maria Konnikova, *You Have No Idea What Happened,* NEW YORKER Feb. 4, 2015, *available at* http://www.newyorker.com/science/maria-konnikova/idea-happened-memory-recollection........................................................................... 16

## Statement Regarding Oral Argument

Petitioner does not believe that oral argument would significantly assist this Court in resolving the issues set forth herein.

## Statement of the Case

Rogelio Aviles-Barroso was charged by indictment on January 11, 2013 with Capital Murder. (CR at 22). The indictment alleged that the offense occurred over twenty years prior on September 29, 1992. (CR at 22). Mr. Barroso filed a Motion to Suppress the In-Court Identification on August 29, 2013. (CR at 83, 147). The court denied this on January 27, 2014. (CR at 149). On February 4, 2014, a jury found Mr. Barroso guilty of the charged offense at which time Judge Renee Magee sentenced him to life without parole in prison. (CR at 211-213).

The trial court certified Mr. Barroso's right to appeal on February 4, 2014. (CR at 217). His trial counsel was allowed to withdraw and undersigned counsel was appointed to represent him on appeal. (CR at 218).

## Statement of Procedural History

The Fourteenth Court of Appeals affirmed Mr. Barroso's conviction on August 27, 2015. *Aviles-Barroso v. State*, No. 14-14-00142-CR, 2015 WL 5157472

v

(Tex. App.—Houston [14th Dist.] 2015). Mr. Barroso did not file a motion for rehearing.

**Grounds for Granting Review**

1. The appellate court erred in finding suggestive, but not unduly so, a voice identification "show up" made in violation of *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) and *Stovall v. Denno*, 388 U.S. 293, 302 (1967). (C.R. at pg. 147; Vol. 4, pgs. 193, 199; Vol. 6, pg. 123).

2. The *Neil v. Biggers* factors applied by this Court fail to protect a defendant's due process rights in the context of a voice identification made twenty years after the offense. Applying the *Biggers* factors to assess reliability fails to account for the reality that scientific studies demonstrate that (1) the continued application of some of these factors and (2) the failure to account for other relevant factors will result in misidentification and wrongful convictions. (C.R. at pg. 147; Vol. 4, pgs. 193, 199; Vol. 6, pg. 123). *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

3. The appellate court erroneously found that the record included evidence of identification reliability which outweighed the corruption of the caused by any unduly suggestive procedure. (C.R. at pg. 147; Vol. 4, pgs. 193, 199; Vol. 6, pg. 123).

vi

**<u>Argument</u>**

*Background*

In 1992, two masked men broke into the apartment that Diana Garcia shared with her boyfriend, Arturo, and son, Angelo. (Vol. 4, pgs. 172-173). Both men entered her bedroom apartment. (Vol. 4, pgs. 173, 176). One man beat Arturo while the other man sexually assaulted Garcia. (Vol. 4, pgs. 180-182). After the men left, Garcia and Arturo realized that the two men had taken Angelo. (Vol. 4, pgs. 183-184). When officers arrived, Garcia described the man who had beaten Arturo as having a "foreign," non-Mexican accent. (Vol. 3, pg. 85, Vol. 4, pgs. 57, 219). The perpetrator was masked so that Garcia's physical description of him was limited to his dark-complected wrist area, his tall height, the whites of his eyes, and his lip size and lip color. (Vol. 4, pgs. 186-188). Authorities later found Angelo's remains in a Baytown creek.

The case remained unsolved until 2008 when Obel Cruz-Garcia was arrested for capital murder through DNA evidence connecting him to the sexual assault of Garcia. (Vol. 5, pg. 154). At some point after Cruz-Garcia's arrest in 2008, law enforcement played three voices familiar to Garcia on separate occasions. (Vol. 5, p. 189) Garcia identified the voices of each of these men, Obel Cruz-Garcia ("Chico"), Carmelo Santana ("Rudy") and Leonardo Germane, as individuals she

had spoken with in the past. (Vol. 3, pgs. 67-71, 92-93, Vol. 5, pgs. 186-187). Each of these men spoke with accents from their home country of the Dominican Republic. (Vol. 3, pgs. 72-75, 96).

While serving time in federal prison, in 2012, Carmelo Santana told authorities that he drove Cruz-Garcia, Mr. Barroso, and Angelo from Diana Garcia's apartment on that night in 1992. Santana said that Cruz-Garcia ordered Mr. Barroso to kill Angelo. (Vol. 5, p. 116, 121, 123).

To confront this accusation, Mr. Barroso agreed to speak with Harris County Investigator Gillie. Gillie recorded Mr. Barroso speaking with his wife after the interview. This conversation included discussion of why officers were arresting Mr. Barroso. (Vol. 6, p. 143). Mr. Barroso speaks with a Puerto Rican accent. (Vol. 6, p. 11)

A short time after the interview, Diana Garcia visited ADA Tise at the district attorney's office to discuss the upcoming trial of Cruz-Garcia. While seated in the district attorney's office in the presence of ADA Tise and Investigator Gillie, Gillie played the recent recording of Mr. Barroso's voice. (Vol. 3, pgs. 64, 75, 78; Vol. 6, pgs. 125-126). No other voices were played for Garcia on this date, twenty years after the offense date. (Vol. 6, pg. 139). ADA Tise acknowledged that at this time she and Garcia were focused on uncovering the identity of the only remaining unknown—the tall man. (Vol. 4, pgs. 196-197). Without a lineup for comparison,

2

Garcia understandably latched onto the voice of the first Puerto Rican man that law enforcement played for her.

Upon hearing the voice, Garcia began to cry, and she then positively identified Mr. Barroso's voice as that of the tall man she had heard in her apartment twenty years before. (Vol. 4, pgs. 200, 202, Vol. 6, pg. 129).

At trial, when questioned about why Gillie and Tise failed to expose Garcia to other male Puerto Rican voices, Gillie simply responded: "We did not do it that way." (Vol. 6, pg. 139).

Over objection, the court allowed testimony about the pre-trial voice identification. The State then covered all but the eyes and lips in a photograph of Mr. Barroso taken about a week after the offense. (Vol. 4, pgs. 193-194). Garcia identified the man in the photograph as the man whose voice she identified and then pointed to Mr. Barroso in court as an older version of the man in the photograph who she had just identified. (State's Exhibit 101; Vol. 4, pgs. 193-194). Aside from the identification procedure, the state's case depended on the accomplice-witness testimony of Carlos Santana.

*Mr. Barroso's argument to the Fourteenth Court of Appeals regarding the question for this Court's review*

Mr. Barroso argued that the failure to protect him from misidentification with a voice lineup caused Garcia to identify the perpetrator's voice under incredibly

suggestive circumstances leading to a substantial likelihood of irreparable misidentification such that the trial court erred in admitting evidence of the pretrial identification. (Appellant's Brief, pgs. 6-19).

*Fourteenth Court Response*

The appellate court affirmed the trial court's decision to admit the testimony regarding the pretrial voice identification finding that the identification procedure "was suggestive but not impermissibly so" on the following basis: (opinion, p. 29)

- The recordings of three other men were played for Garcia after the state charged Cruz-Garcia with capital murder. (opinion, p. 24)

- Garcia was not familiar with all three of the voices played for her on various occasions before the day that she heard Mr. Barroso's voice. (opinion, p. 28)

- Garcia's visit to the district attorney's office was not planned. (opinion, p. 25)

The Fourteenth Court then concluded, that even assuming an unduly suggestive lineup procedure, the identification was nonetheless reliable applying the factors set forth in *Neil v. Biggers* in the following way:

- Witness's opportunity to hear the criminal at the time of the crime
  - Garcia paid enough attention to describe the perpetrator's "voice, the dialect, or a language peculiarity" near the time of the offense

  - Garcia heard the perpetrator speak while being sexually assaulted

  - "no evidence that Diana was not attentive or that her attention was distracted"

- o "no evidence that Diana heard only 'a few phrases' spoken to her husband that night"

- o "no evidence that Diana did not have an adequate opportunity to hear appellant's voice during the time she was being raped by Cruz-Garcia and her son abducted" (opinion, p. 37)

- Witness's degree of attention
  - o Relied heavily on state expert Dr. Lisak's testimony regarding trauma and memory housed in the amygdala (opinion, p. 33-34)

- Accuracy of witness's prior description of criminal
  - o The morning after the incident, Garcia said she could identify the man's voice again if she heard it
  - o Garcia described the voice as non-Mexican with a foreign accent (opinion, p. 34)

- Level of certainty demonstrated by the witness at the confrontation
  - o Garcia started crying when hearing the recording and "said she was absolutely positive that the voice belonged to the man who did all the talking on the night that her son was taken" (opinion, p. 35)

- Length of time between crime and confrontation
  - o Dr. Lisak's testimony "regarding the durability of memories created by traumatic events" is sufficient to demonstrate reliability. (opinion, p. 39).

*An impermissibly suggestive pre-trial voice identification procedure violates a defendant's Federal and State constitutional right to due process of law*

When a pre-trial identification procedure is unnecessarily suggestive and therefore conducive to misidentification, use of that identification at trial constitutes a denial of the defendant's constitutional right to due process of law. *Stovall v. Denno,* 388 U.S. 293, 301–302 (1967).

5

To challenge an identification on due process grounds, a defendant must show through clear and convincing evidence (1) that the pretrial identification procedure was impermissibly suggestive and (2) that the suggestive pretrial identification gave rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). The totality of the circumstances determines the reliability of the identification. *Barley*, 906 S.W.2d at 33.

*The use of a single, Puerto Rican voice played twenty years after the offense unduly suggested to Garcia that Mr. Barroso's voice belonged to the unknown perpetrator*

Suggestiveness may arise from the manner in which a pretrial identification procedure is conducted. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). Given the potential for misidentification, if suggestive procedures are employed, courts have recognized that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *Manson v. Braithwaite*, 432 U.S. 98, 109 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

While very few Texas cases deal with auditory identification procedures in which an officer plays only one voice for a witness, this Court has long held that a similar single photograph "line up" is improperly suggestive. *Delk v. State*, 855

6

S.W.2d 700, 706 (Tex. Crim. App. 1993); *Madden v. State*, 799 S.W.2d 683, 695-95 (Tex. Crim. App. 1990).

*Only one voice played for Garcia*

When asked why a voice lineup or array was not administered, Gillie simply said: because "we did not do it that way." (Vol. 6, pg. 139). On cross examination, Gillie admitted that "due to circumstances," they did not take the time to gather other voices with Puerto Rican dialects so that Garcia would have to compare Mr. Barroso's voice against other speakers with a similar dialect. (Vol. 5, p. 141). Nothing in the record demonstrates that any exigency excused the state's deprivation of Mr. Barroso's due process protection.

Despite efforts to describe the scene as one where Gillie surprised Garcia when he played the recording in the midst of casual conversation, ("And, so, basically we were just talking and I clicked on the computer and played something?") the record demonstrates Garcia was expecting to hear the voice of the tall man. (Vol. 4, pgs. 200, 243). Garcia testified that she knew that when she heard a voice at the DA's office, it belonged to a suspect. (Vol. 4, pg. 231). Testimony that Garcia merely dropped by the office on that date to discuss the case does not diminish the known expectation of everyone in the room that the voice played would belong to the only remaining unknown suspect. (Vol. 3, pg. 75).

*Only one voice played for Garcia in a recording that referenced Mr. Barroso's arrest*

Investigator Gillie acknowledged that the portion of the recording played for Garcia included Mr. Barroso, a man from Puerto Rico, speaking in Spanish to his wife about why he was arrested in the case. (Vol. 6, p. 143).

*Only one voice played for Garcia after Mr. Barroso was charged with capital murder*

At the time Gillie and Tise played the recording for Garcia, the state had already charged Mr. Barroso with capital murder. (Vol. 6, pgs. 146-147).

*Other voices played for Garcia years before and on separate occasions belonged to men that Garcia had heard before and speaking in dialects different from Mr. Barroso's Puerto Rican voice*

The appellate court found that because at some point three other voices were played for Garcia that the voice "showup" was not unduly suggestive.

Although the former investigator on the case, Investigator Webb, had played other voices (each on separate occasions) long before Garcia's exposure to Mr. Barroso's Puerto Rican voice, Garcia recognized each of the non-Puerto Rican speakers on those recordings as men with whom she had spoken before (Carmelo "Rudy" Martinez Santana, Obel Cruz-Garcia, and Leonardo German) (Vol. 3, pgs. 67-72, 92-93, Vol. 4, pgs. 199-200, Vol. 5, pgs. 186-187). Mr. Barroso's was the first and only unfamiliar voice that Garcia heard with a non-Mexican Spanish accent.

8

Without a lineup for comparison, she understandably latched onto the first unknown voice with a different dialect as belonging to the only remaining unknown suspect. (Vol. 4, pgs. 196-197).

*"Showup" identification corrupts reliability*

Once the defendant has established that the identification procedure was impermissibly suggestive, the court must then weigh the following factors "against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances": (1) the witness's opportunity to view and hear the perpetrator at the time the crime is committed; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty that the witness demonstrated upon confrontation; and (5) the length of time between the crime and confrontation. *See Biggers*, 409 U.S. at 199; *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

*Erroneous reliability finding and factors that lack a scientific basis*

The undue suggestiveness of the identification procedure and the twenty-year gap between offense and identification dilutes any potential reliability argument made under the *Biggers* factors.

Further, due process requires a court to consider factors rooted in science to determine the reliability of an identification procedure. As Justice Frost observed in her concurrence: "The gaps in science and law, known and unknown, tell us that the

*Biggers* test may be falling short as a measure of reliability for voice identification. Now is the time to consider what steps can be taken to improve reliability testing in voice-identification cases." (Concurring opinion, p. 6).

Other supreme courts have acknowledged the progression of science since 1977 and adapted their reliability analysis accordingly. "We recognize that scientific research relating to the reliability of eyewitness evidence is dynamic; the field is very different today than it was in 1977. . . [courts and police] must rely on reliable scientific evidence that is generally accepted by experts in the community." *State v. Henderson*, 208 N.J. 208, 292, (2011); *see also State v. Ramirez*, 817 P.2d 774, 780 (Utah 1991) (expanding reliability factors to consider where "several of the criteria listed by the [Supreme] Court are based on assumptions that are flatly contradicted by well-respected and essentially unchallenged empirical studies"); *State v. Hunt*, 69 P.3d 571, 576-77 (Kan. 2003) (expanding *Biggers* factors because of the great weight jurors attach to eyewitness identification and the studies documenting its unreliability); *Brodes v. State*, 614 S.E.2d 766, 770 (Ga. 2005) (noting that in "the 32 years since the decision in *Neil v. Biggers,* the idea that a witness's certainty in his or her identification of a person as a perpetrator reflected the witness's accuracy has been "flatly contradicted by well-respected and essentially unchallenged empirical studies").

*The failure of the Biggers factors as applied to Mr. Barroso's case*

- **Witness's opportunity to hear the criminal at the time of the crime**

- **Witness's degree of attention**

The appellate court found that these factors weighed toward reliability because Garcia said from the beginning that she could identify the voice of one man who "did all the talking" and described that voice. (Majority opinion, p. 37).

According to Garcia, the tall man gave six commands, five of which were spoken to her boyfriend, before (1) the other man with a gun placed a pillow and sheet over her head and sexually assaulted her and (2) while her young son called out to her. (Vol. 4, pgs. 174-186, 224-225, 246). These facts demonstrate that Garcia's attention and concentration upon the perpetrator's voice through his limited speech was divided between her son, her boyfriend, and the other gunned man in the room.

Further, applying this factor to voice identification raises serious constitutional concerns as the *Biggers* factors do not account for the following:

1. The human brain processes a person's face differently than a person's voice

2. Studies show "adequate opportunity to hear" weighs in favor of reliability only in terms of the witness's exposure to a voice on separate occasions

11

3. When an observation is made under stressful circumstances, the risk of misidentification increases.

Brain processing of faces v. voices

The application of the *Biggers* factors to voice identification is questionable as the brain processes a face differently from a voice. "The fundamental differences between the way the human brain processes a face and the way the human brain processes speech may mean there are differences between the factors that indicate a reliable visual identification and those that indicate a reliable vocal identification." Cindy E. Laub et al., *Can the Courts Tell an Ear From an Eye? Legal Approaches to Voice Identification Evidence*, 37 Law & Psychol. Rev. 119, 123 (2013).

The relevant inquiry: voice distribution over time

Studies show that the length of time or quantity of words has little impact on whether a witness will correctly identify an unfamiliar speaker later on. In one study, listeners heard a 162-word utterance from an unfamiliar speaker. Two weeks later, the correct identification rate was only 29%. For listeners who heard the same speech sample over three consecutive days, they correctly identified the voice two weeks later at a rate of 100%. In another study, listeners were limited to an 11-word speech sample which "produced chance-level guessing behavior." See Kenneth Deffenbacher, *Relevance of Voice Identification Research to Criteria for Evaluating Reliability of an Identification*, J. of Psych, at 112 (1988).

12

Garcia heard six commands on one stress-induced occasion twenty years ago. According to the above study, her identification was a product of "chance-level guessing behavior."

Observations made under extreme stress dilute significance of opportunity to hear or view factor

"[S]tudies have shown consistently that high degrees of stress actually impair the ability to remember." *See, e.g.,* Kenneth A. Deffenbacher et al., *A Meta–Analytic Review of the Effects of High Stress on Eyewitness Memory,* 28 *Law & Hum. Behav.* 687, 687, 699 (2004); see also *State v. Henderson*, 208 N.J. 208 (2011) (relying on Deffenbacher study in modifying factors for court's reliability determination for admissibility purposes).

- **Accuracy of witness's prior description of criminal**

Justice Frost's concurrence highlighted the scientific doubt in the validity of this factor to assess an identification's reliability. (concurring opinion, p. 3 *citing* Laub, supra, at 124.). As explained below, studies support this concern.

Voices change over twenty years

In Mr. Barroso's case, change in the tone or pitch of his voice over the twenty-year period weighs against the relevance of this factor. Recognition of a previously heard unfamiliar voice will be less accurate if "the tone or pitch of the voice has been altered, if the exposure time or speech duration is short, or if there is a delay between original exposure and subsequent identification." Gary Edmond, et. al., *Issues with*

*('Expert') Voice Comparison Evidence*, 35 Melb. U. L. Rev. 52, 88-89 (2011). "Speech is variable across time, making it hard to identify a person on the basis of one speech sample." *See* Jose H. Kerstholt, *Earwitnesses: Effects of Accent, Retention, and Telephone*, Appl. Cognit. Psychol. 20: 187-197, at 196 (2006). "Accuracy of auditory identification depends on other similarities between the initial encounter and when the voice is identified." *See* Laub, *supra*, at 6 (*citing* Daniel Read & Fergus I.M. Craik, E*arwitness Identification: Some Influences on Voice Recognition*, 1 J. Experimental Psychol.: Applied 6, 15-17 (1995).

Greater scrutiny required for identification of an unfamiliar voice with a
foreign accent

Mr. Barroso's case highlights another deficiency in the *Biggers* factors. As noted in the concurrence, the factors fail to account for the consistent inability of witnesses to identify unfamiliar, foreign voices.

The unfamiliar voice

A recent study shows a 51% rate of incorrect voice identification when a person is asked to identify a voice heard once before. This rate declines to 8% after three weeks. See Gary Edmond, et. al., *Unsound Law: Issues with ('Expert') Voice Comparison Evidence*, 35 Melb. U.L. Rev. 52 at 88-89 (2011)

The unfamiliar, foreign dialect

People "recognize native voices with greater accuracy than foreign voices." Jose H. Kerstholt, et al., *Earwitnesses: Effects of Accent, Retention, and Telephone*,

14

Appl. Cognit. Psychol. 20, at 196 (2006). A person native to a particular country will recognize subtler differences in voices from the same country. *Id.* For example, a person from the United States will recognize a southern accent, and perhaps even hear the subtle dialectal differences between particular southern states or cities. However, "with no such knowledge of the more subtle differences in the voices of a foreign country, foreign recognition accuracy was essentially no better than random chance (13% overall accuracy versus 10% random chance)." *Id.*

In Mr. Barroso's case, defense expert Dr. Lyons testified about the same concept: "[T]here are studies that do show that when a listener is hearing someone who speaks the same language with the same accent as the listener does, it's easier for that listener to identify that person subsequently than it is to identify somebody who speaks with a different dialect." (Vol. 6, pgs. 18-19).

Garcia spoke Mexican Spanish. She described the tall man as having a foreign, non-Mexican accent. She noticed what any person would notice immediately—an accent different from her own. Garcia failed to note anything beyond a foreign accent that would assist her in distinguishing the perpetrator's voice from another unfamiliar foreign accent. The State's effort to accentuate some distinction in Garcia's description of the voice is made apparent in the prosecutor's direct examination of Agent Johnson who can agree only with the statements that people

15

"with a foreign accent [speak] different from what people in Mexico talk." (Vol. 5, p. 34)

*Level of certainty that the witness demonstrated upon confrontation*

Upon hearing Mr. Barroso's voice, Garcia cried and positively identified his voice. Although this *Biggers* factor lacks scientific relevance, the appellate court placed great weight on Garcia's certainty of identification made 20 years later.

Scientists have found that confidence in memory far exceeds consistency in memory when it comes to traumatic events. See Maria Konnikova, *You Have No Idea What Happened* NEW YORKER Feb. 4, 2015, *available at* http://www.newyorker.com/science/maria-konnikova/idea-happened-memory-recollection:

> [M]emories of emotional events do indeed differ substantially from regular memories. When it comes to the central details of the event, like that the Challenger exploded, they are clearer and more accurate. But when it comes to the peripheral details, they are worse. And our confidence in them, while almost always strong, is often misplaced.

*See* Konnikova, *supra* (*citing* Joseph Dunsmoor, Vishnu Murty, Lila Davachi, & Elizabeth Phelps, *Emotional Learning Selectively and Retroactively Strengthens Memories for Related Events*, Nature 520, 345-348 (16 April 2015), *available at* http://www.nature.com/nature/journal/v520/n7547/full/nature14106.html.

16

While the memory of a traumatic event is durable, memories of the peripheral details (e.g. color, sound, and location) are not. Garcia will never forget the horrific events of that day twenty years ago, but studies show her confidence in the memory of the horrific event itself does not translate to her memory of the unknown perpetrator's voice—a peripheral detail. "The strength of the central memory seems to make us confident of all the details when we should only be confident in a few." *See* Konnikova, *supra*. Dr. Yonovitz testified that a traumatic memory "is not as impaired [by time] but the peripheral details are not stored, the peripheral details of the event. And certainly the nuances of the voice, a voice that can actually change over a 20 year period, too, is a peripheral detail, the feature of the voice." (Vol. 7, pgs. 105-106).

Despite the lack of correlation between reliable identification and stated confidence, courts and jurors tend to place great weight on this factor as did the court in Mr. Barroso's case. *See* Laub, *supra* at p. 124, 141. ("Confidence-accuracy correlations for unfamiliar speakers are non-significant or relatively low, and can even be negative. . . mean[ing] that more confident listeners are actually less accurate in their voice identifications.").

*Length of Time Between Offense and Identification*

Nothing in the record demonstrates that a voice heard or face seen, even if during a traumatic experience, can withstand twenty years in one's memory without

17

decay or dilution. After 20 years, for Garcia, any unknown, male foreign accent sounding similar to the perpetrator's would fit the bill. In *Neil v. Biggers*, the U.S. Supreme Court explained that a lapse of seven months between the crime and identification was in most cases a seriously negative factor. *Neil v. Biggers*, 409 U.S. 188, 201 (1972).

The ability to accurately identify a stranger's voice heard once before declines from 49% to 8 % after three weeks. Gary Edmond et. al., *Issues with ('Expert') Voice Comparison Evidence*, 35 Melb. U. L. Rev. 52, 88-89 (2011). The defense expert testified about the inevitable decay of memory as it relates to witness identification. However, the appellate court placed great weight on expert testimony on the durability of witness memory to traumatic events. (Majority opinion, pgs. 32-33).

## Prayer for Relief

Mr. Barroso's sentence of life without parole rests in large part on the voice identification evidence admitted in violation of his constitutional right to due process of law. The appellate court erred in (1) affirming the trial court's finding that the pre-trial identification was suggestive – but not unduly so; (2) affirming the trial court's finding that the identification was reliable; and (3) applying factors to determine reliability that lack scientific validity. Because this is harmful error, Mr. Barroso asks this court to reverse his conviction and remand for a new trial. Tex. R. App. P. 44.2 (West 2015). Affirmation of law enforcement conduct in direct violation of a defendant's due process rights encourages police and prosecutors to

continue suggestive procedures that pose a serious risk of misidentification and wrongful conviction.

/s/ Gerald E. Bourque/s/
GERALD E. BOURQUE
24 Waterway Avenue, Ste 660
The Woodlands, Texas 77380
(713) 862-7766
Bar Card No. 02716500
Gerald@geraldebourque.com
Attorney for Petitioner
Rogelio Aviles-Barroso

### Certificate of Compliance

Counsel certifies that Appellant's brief includes 4,112 words from the Statement of Facts through the Prayer. Tex. R. App. Proc. 9.4(i)

/s/ Gerald E. Bourque/s/
GERALD E. BOURQUE
24 Waterway Avenue, Ste 660
The Woodlands, Texas 77380
(713) 862-7766
Bar Card No. 02716500
Gerald@geraldebourque.com
Attorney for Petitioner
Rogelio Aviles-Barroso

19

## Certificate of Service

Counsel certifies that Appellant's brief was emailed to the Appellate Division of the Harris County District Attorney's Office on the 28th day of October, 2015.

/s/Gerald E. Bourque/s/

GERALD E. BOURQUE
24 Waterway Avenue, Ste 660
The Woodlands, Texas 77380
(713) 862-7766
Bar Card No. 02716500
Gerald@geraldebourque.com
Attorney for Petitioner
Rogelio Aviles-Barroso

20

PD-1258-15

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

_____

ROGELIO AVILES-BARROSO,
Petitioner
v.
STATE OF TEXAS
_____

**APPENDIX**



In The

# Fourteenth Court of Appeals

---

## NO. 14-14-00142-CR

---

**ROGELIO AVILES-BARROSO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause No. 1364839**

---

## M A J O R I T Y   O P I N I O N

A jury convicted appellant Rogelio Aviles-Barroso of capital murder[1] and the trial court assessed his punishment at life imprisonment. Appellant contends on appeal that (1) the trial court reversibly erred by allowing witness testimony about a "pre-trial voice identification" and allowing an "in-trial identification" because the pre-trial voice identification was unduly suggestive and led to a substantial likelihood of misidentification; (2) his conviction is not supported by legally sufficient evidence because the identification testimony was inadmissible and the accomplice witness

---

[1] *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2014).

testimony was not sufficiently corroborated; and (3) his bill of costs should be modified to delete several assessed costs because they constitute "a penalty as applied to" appellant and were not "orally pronounced as part of his sentence." We affirm the trial court's judgment as modified.

## BACKGROUND

### A.     Overview

Diana Garcia, her six-year old son Angelo Garcia, and her boyfriend Jose Arturo Rodriguez lived in a small two-bedroom apartment in Houston, Texas in 1992. Diana and Arturo had been selling drugs out of their apartment. Obel Cruz-Garcia was their drug supplier. Cruz-Garcia and his wife's cousin, Carmelo Martinez Santana, regularly came to Diana's and Arturo's apartment to deliver drugs until Cruz-Garcia and Arturo "got into a little misunderstanding" sometime in 1992; afterwards, Diana and Arturo decided to stop selling drugs.

On the evening of September 30, 1992, Diana and Arturo were awakened by a loud noise coming from their living room. Their front door had been kicked in. Arturo got out of bed, walked toward the front door, and was met by a tall, husky, masked man holding a gun. The man ordered Arturo to go back into the bedroom, kneel down, and put his face on the bed; he tied up Arturo with a cord and started beating Arturo. The man also ordered Diana to lay face-down on the bed.

A second masked man then entered the bedroom holding a gun. Diana was covered with a sheet and sexually assaulted by the second man who had entered the bedroom. The second man never spoke a word. Only the first man spoke to Diana and Arturo in English and Spanish; according to Diana, the first man "did all the talking." While Diana was being sexually assaulted, she could hear Angelo crying and Arturo being beaten. After the sexual assault, the men ransacked the bedroom and left. Diana managed to untie herself and Arturo. She realized that Angelo had been kidnapped and

2

contacted the police.

Police believed the crimes were drug-related and the perpetrators kidnapped Angelo to use him as a "bargaining chip." The FBI suspected that Cruz-Garcia was the second man who had sexually assaulted Diana; he had not entered the apartment until Diana's and Arturo's eyes were covered because Diana and Arturo would have been able to recognize Cruz-Garcia, "his voice, his stature." Very early on in the investigation, law enforcement learned that Cruz-Garcia fled Houston for Puerto Rico or the Dominican Republic. Police interviewed Cruz-Garcia's wife, Santana, and several other individuals and collected DNA samples. The investigation continued.

On November, 5, 1992, "skelet[al] remains with a rock next to the body or on the body and clothing" were found on the bank near Goose Creek in Baytown. Dental records confirmed that the remains were Angelo's. However, many years passed and the crimes committed on September 30, 1992, went unresolved.

The Houston Police Department created a cold case squad within the homicide division to work on unsolved crimes in November 2004. Sergeant Mehl joined the squad and started working on solving Angelo's murder. In May 2008, Sergeant Mehl found Cruz-Garcia, whom he knew had been a primary suspect in the case, in custody in Puerto Rico and obtained a DNA sample from him. Cruz-Garcia's DNA profile matched the DNA profile developed from Diana's rape kit. Later, Cruz-Garcia was charged with the capital murder of Angelo.

Police continued investigating to find the man who had first entered Diana and Arturo's apartment and beaten Arturo. During the investigation, police played voice recordings for Diana of Cruz-Garcia, Santana, and an individual named Leonardo German because Diana told the police in 1992 that she could identify the first man by his voice. After hearing the three individuals' voice recordings, Diana did not identify any of them as the first man.

3

Law enforcement decided to interview Santana again to see if he could help identify the first man who was involved in Angelo's abduction. Santana was located in a prison in Pennsylvania where he was serving a sentence for a drug-related offense. During his interview with two FBI agents, Santana at first denied knowing anything about Angelo's kidnapping and murder but then acknowledged being with Cruz-Garcia and appellant the night Angelo was killed in 1992. Santana revealed he had gone with Cruz-Garcia and appellant to Diana's and Arturo's apartment. He described in detail his, Cruz-Garcia's, and appellant's involvement in the kidnapping and murder of Angelo.

After learning of appellant's involvement in the crimes, law enforcement worked on locating appellant. It took Investigator Kerry Gillie several months to find appellant; it seemed appellant "moved around a lot." Investigator Gillie went to appellant's house in Georgia and introduced himself as a police officer from the Harris County District Attorney's Office in Houston. Appellant agreed to be interviewed by Investigator Gillie. After the interview, appellant called his wife on his cell phone. Appellant's interview and phone call both were recorded. Following the interview and phone call, Investigator Gillie arrested appellant and charged him with capital murder on October 16, 2012.

While appellant was in custody in Houston, Diana called assistant district attorney Natalie Tise to stop by for a visit. Diana would visit with Tise and Investigator Gillie regularly to discuss "what was going on with the case;" on this occasion, they discussed travel plans for Cruz-Garcia's trial, which had been reset. During Diana's visit, Investigator Gillie asked Diana to listen to a voice recording to "see if she recognized the voice as being a person that was involved that night that Angelo Garcia, Jr. was taken, if she recalled that voice." Investigator Gillie then played the recording of appellant's phone call to his wife. Diana immediately recognized appellant's voice

4

as the voice of the man who first entered her apartment in 1992.

## B.    Hearing on Motion to Suppress

Appellant's trial for capital murder was held from January 27, 2014 to February 4, 2014.  After voir dire, the trial court held a hearing outside the jury's presence on appellant's motion to suppress the identification of appellant's voice "based on an improper and suggestive audio review."

At the hearing, the trial court heard testimony from several experts who opined on identification procedures; voice identification and memory decay; and how memories of traumatic events are stored in the human brain.  The trial court also heard testimony from Investigator Gillie, who described how the voice identification of appellant occurred; he also described how Diana immediately and positively identified appellant's voice as being the voice of the first man.  Officer U.P. Hernandez, who had been involved in the investigation of the case since October 1, 1992, and had interviewed Diana at the time, testified that Diana described the first man's appearance.  He described Diana's statements that the man spoke with a foreign Spanish accent and that she could recognize the man's voice.  Investigator Micah Webb, who also had been involved in the investigation, testified that Diana had listened to voice recordings of Cruz-Garcia, Santana, and Leonardo German during the investigation but did not identify any of the voices as being the voice of the first man.

Appellant argued at the hearing that Diana's voice identification was inadmissible for two reasons.  First, he contended the "method used in this case was improperly suggestive" because (1) Diana did not state that she could recognize the first man's voice until later in the investigation; (2) appellant is "20 years older, his voice has changed," and Diana did not point to anything specific in his voice except to say the man spoke in a different Spanish dialect; (3) the State did not present Diana with a voice line-up of two or three individuals from Puerto Rico speaking with the same dialect as

appellant; and (4) the other three voice recordings played for Diana were of men she had known, and they were not played the same day as appellant's voice recording. Second, he contended that a 20-year gap between Diana first hearing appellant's voice and her identification of appellant's voice was too long for an identification to be accurate.

The trial court denied appellant's motion to suppress and stated:

> And the Court is prepared to make a ruling on the record regarding the defendant's motion to suppress the in-court identification of the defendant, having heard testimony concerning this motion . . . . And this morning I do want to make the following findings on the record.
>
> I do find that according to the testimony of the two investigators, Investigator Gillie and also Investigator -- let me make sure I've got that name -- U.P. Hernandez. According to Investigators Kerry Gillie and U.P. Hernandez, who had an opportunity to review the offense reports and who did investigation throughout the investigation on this case, testified that Diana Garcia was a witness to the original offense of alleged capital murder in this case, and that she did have an adequate opportunity to listen to the assailant at the time of the offense, that according to Officers Gillie and U.P. Hernandez, that Diana had been blindfolded, her home broken into, her son was kidnapped, and she was allegedly sexually assaulted during the time she heard one assailant speak to at least one other assailant present and did not ever see this individual -- this individual's face.
>
> I also make the finding that according to the detectives, Diana Garcia, the witness, said she could identify the assailant's voice at an interview close in time to the alleged offense and that she had paid enough attention to describe the assailant's voice, the dialect, or a language peculiarity at an interview that was made close in time to the alleged commission of the offense.
>
> I do make a finding that Diana Garcia's reaction, described by Investigator Gillie, to the voice showup or the voice exemplar that was played to her, the voice being that of the defendant, Rogelio Aviles-Barroso, was described by Officer -- excuse me -- Investigator Gillie as being very emotional at the time she heard the voice of the assailant, that she cried, and her I.D. was positive that that voice was the voice of her assailant. I do make a finding that that exemplar was played to her some 20-plus years after the offense allegedly occurred.

6

I do make a finding that Investigator Gillie never suggested to Diana Garcia, the witness, whose voice that was or suggest that that voice was that of her assailant, and that the pretrial identification procedure was not impermissibly suggestive on its face, that other voice samples had been played for Diana Garcia previously and she was not able to identify those other exemplars as being that of her assailant.

I do make a finding that since it was such an extended time between the crime and the playing of the voice exemplar to Diana Garcia that that is a concern to the Court and that it could be unreliable. However, that's diminished due to the testimony of the expert that was put on by the State, explaining that, giving a reasonable explanation, and that the totality of the circumstances reveals that there was no substantial likelihood of misidentification and that the pretrial procedure was not impermissibly suggestive.

So, I am going to let it go to the jury. The defendant's motion to suppress the in-court identification of the defendant, the voice identification, is denied. So, we'll let that go to the jury.

I also will allow the jury to hear all three experts that testified in this hearing regarding the different aspects of voice identification and their expertise, this being a very unique identification. And the different aspects that they address will each be able to be thoroughly presented before the jury.

Trial resumed after the trial court's ruling on appellant's motion to suppress.

## C. Trial Testimony

Diana testified at trial in detail about the events that occurred on September 30, 1992.

Diana recalled that she and Angelo went to bed around 10:00 p.m. on September 30, 1992, and that Arturo went to bed shortly thereafter. Just a short time after she had fallen asleep, Diana woke up because of a loud bang coming from the front door leading into the living room. Arturo got up to see what was going on. Diana then saw Arturo walking backwards into the bedroom because a tall, husky, masked man pointed a gun at Arturo and ordered him to "Go back, go back." The man told Arturo, "Walk back, lay down, lay down on the side of the bed." The man also instructed Arturo to kneel

7

down by the bed, put a pillow in his mouth, and "open [his] hands to the back;" he tied Arturo with the alarm clock cord and immediately started beating Arturo. Diana asked the man in English and Spanish, "Why are you doing this?" The man told Diana to "turn face-down" and to "turn around and lie on [her] stomach, right, lie flat on the bed." At that time, she saw a second masked, armed man by the apartment door but she could not get a good look at him.

Diana testified that she could hear the first man's voice in the small bedroom and "very much" focused on his voice. She testified that, after she laid face-down on the bed, a pillow and a sheet were put over her head. The second man then tied her hands on her back, turned her around and sexually assaulted her; "[t]he pillow and the sheet were still on [her] face." The second man never said a word, and Diana never saw his face. During this time, Diana could hear the first man beating Arturo and her son Angelo crying. After the sexual assault, the men left and she managed to untie herself and Arturo. Diana realized that the men had kidnapped Angelo and called the police.

Diana was interviewed at the police station in the early morning on October 1, 1992, by Officer U.P. Hernandez after her sexual assault exam at the hospital and signed her statement around 6:30 a.m. that morning. Diana testified that she described the first masked man who entered the apartment to Officer Hernandez as being a "6-foot or a little bit higher," "husky, well built," "dark complected" Hispanic man with "big, bulging, very white" eyes and "big, bubbly," "purple-ish" lips. Diana told Officer Hernandez "from the very beginning, October 1st" that she could "recognize the voice of the person, the first man who did all of the talking," and she could "remember his eyes and his mouth or how he looked in a mask."

Diana testified that the first man spoke English and Spanish with a "very, very different accent." His accent was "entirely different" from "an accent from a person from Mexico." Diana testified that she had never seen the first man before or heard his

8

voice.  According to Diana, the first man could not have been Santana because Santana was skinny, shorter, and "white complected."  She also testified that she would have been able to recognize Cruz-Garcia's and Santana's voices.

The State showed Diana a photo of appellant's face from 1992 marked as State exhibit 101; as instructed by the State, Diana covered up the face, except for appellant's lips and eyes.  Diana then stated stated that she recognized "his eyes" and "his lips." She testified that "those eyes and lips look like the eyes and lips of the man that was the first man in the room that night."  Diana also identified appellant in the courtroom as the person "who looks like" the man in State exhibit 101.  The State offered State exhibit 101 into evidence but the trial court did not allow its admission at that time.

Diana testified that Sergeant Mehl called her years after the sexual assault and Angelo's abduction to tell her that police had located and arrested Cruz-Garcia in Puerto Rico.  DNA evidence showed that Cruz-Garcia was the man who had sexually assaulted her in 1992.  It took some time to bring Cruz-Garcia from Puerto Rico to Houston for trial.  Diana testified that she and Assistant District Attorney Tise met many times to prepare for Cruz-Garcia's trial, at which Diana testified in the summer of 2013.  While preparing for Cruz-Garcia's trial, Diana came to Tise's office to listen to voice recordings of Cruz-Garcia, Santana, and German because police were still investigating the identity of the first man who entered Diana's apartment in 1992.

Diana testified that she heard the three men's voice recordings, but she did not identify any of the played voices as being the voice of the first man.  Diana stated that the three recordings were not played on the same day one after another; rather, the different voice recordings were played for her "over a period of time."  Diana acknowledged knowing Cruz-Garcia and Santana but testified that she "really, really didn't know" German.   Diana testified that she would regularly visit Tise when she would come to Houston and Tise would give her an update on the case.  Diana

remembered coming to Tise's office one day in 2012 as Tise was preparing for Cruz-Garcia's trial. Diana testified that a voice recording was played for her, and she identified the voice she heard on the recording as the voice of the first man who came into her apartment. With regard to how the voice identification occurred, Diana testified as follows:

> [DIANA:] Normally when I come to Houston, I call you [Tise] and I tell you I'm in Houston. And you said: Good. If you have time, you want to come by? And I asked you what time. And you say: Whenever is convenient. I said: Fine, I will come tomorrow morning.
>
> [THE STATE:] Okay. And on that particular occasion, you happened to be in town and came by my office?
>
> [DIANA:] Yes.
>
> [THE STATE:] And usually when that would happen, I would update you on the case, that kind of thing?
>
> [DIANA:] Yes, ma'am.
>
> [THE STATE:] On that day, did I ask you to listen to a [sic] another voice on a tape?
>
> [DIANA:] It was more like we were talking about the case. You were on this side of the table and you played something on the computer and I heard his voice.
>
> *          *          *
>
> [THE STATE:] And, so, basically we were just talking and I clicked on the computer and played something?
>
> [DIANA:] Yes. You clicked on the computer.
>
> [THE STATE:] And do you remember that Investigator Gillie was also there?
>
> [DIANA:] It was Officer Gillie, you, Ms. Tise, me, and my oldest sister, Bennie.
>
> [THE STATE:] Okay. And before that tape was played, did anybody say to you: Diana, we want you to listen to this and this is a suspect in the case?
>
> [DIANA:] No, nobody didn't -- you didn't tell me that.

10

[THE STATE:] Did you -- were you sitting there thinking, I'm fixing to hear the voice of a suspect in the case?

[DIANA:] I was just sitting there listening to you and asking what was going on with the case and it clicked and I heard it.

[THE STATE:] Okay.

[DIANA:] And I started crying and I said: That's the voice of the man who came into my house, into my bedroom.

[THE STATE:] And was that the voice of the tall man?

[DIANA:] The tall, dark complected man, yes.

[THE STATE:] The one who came first.

[DIANA:] The one that came in first.

[THE STATE:] And the one that was --

[DIANA:] The only one that I saw that night.

[THE STATE:] And the only one that was doing the talking?

[DIANA:] Yes, ma'am.

[THE STATE:] When you heard the man, the little tape of the man's voice, was he being interrogated or was he on the phone?

[DIANA:] I just heard his voice, but at the time I didn't know he was interrogated until -- when I heard his voice, he was talking to a lady.

[THE STATE:] Was he on the phone?

[DIANA:] He was on his cell phone.

[THE STATE:] Okay. Talking on the phone. He wasn't being questioned by police officers. Did you hear a police officer?

[DIANA:] I didn't see no police officers. The man was on the phone.

[THE STATE:] Talking to a lady?

[DIANA:] To a lady on the phone.

[THE STATE:] Okay. Did anybody, prior to putting that tape on, tell you: We are going to play you the voice of the tall man to pick out?

[DIANA:] No.

[THE STATE:] Did anybody prepare you for -- or tell you or suggest to you that you needed to pick this person?

\*　　　　　\*　　　　　\*

11

[DIANA:] No, nobody told me.

[THE STATE:] Why did you identify that voice?

[DIANA:] I can still identify the voice if I hear the man. It's still in me. The voice is still inside me just the same as when I feel somebody hug me from my back. I still feel my son hugging me from my back. It's still inside my heart, inside my feelings. The voice is still in my head.

[THE STATE:] Will you ever forget that voice?

[DIANA:] I don't think so.

During cross-examination, Diana stated that, when she listened to the voice recording, she was not "listening for a suspect" but that "[i]t was an 'oops' when the voice came on the computer." She stated: "I recognized the voice. I recognized his voice." She acknowledged that, at the time of the identification, she was not played "anybody else's voice that had that same dialect . . . to compare it to." Diana testified that she was shown "a group of pictures of all the suspects involved in this case" in 1992. Appellant's trial counsel then introduced State exhibit 101 into evidence and the trial court admitted the exhibit. Appellant's trial counsel inquired whether Diana had seen State exhibit 101 in 1992, and she replied that she had not seen the picture in 1992.

Diana testified that the man pictured in State exhibit 101 "looks like the man that went into [her] bedroom." The State published State exhibit 101 to the jury. Looking at exhibit 101, Diana testified that the man pictured is a "dark-complected" man; his skin looks "very dark;" his eyes appear to be "very, very white;" and his "lips look dark purple." Diana denied ever telling the police that two black men came into her apartment in 1992; she claimed that she "said a dark man, dark complected."

Investigator Webb testified at trial that he was assigned to assist Tise in preparing for Cruz-Garcia's trial as well as identifying the other man involved in the crimes that occurred in 1992. In an effort to find the man who was with Cruz-Garcia in 1992, Investigator Webb played voice recordings of Cruz-Garcia, Santana, and German for Diana. Investigator Webb testified that Diana did not identify any of the voices

12

belonging to the first man "who did all the talking that night" as the man law enforcement was looking for.

He testified that Cruz-Garcia and Santana were from the Dominican Republic and German appeared to be from St. Croix, Virgin Islands. Investigator Webb identified photos of Cruz-Garcia, Santana, and German admitted as State exhibits 34, 34-C, and 34-H respectively. He also identified appellant on State exhibit 34-B. He testified that Cruz-Garcia and Santana were not "bulky-built" but that appellant was. Investigator Webb also testified that investigation revealed that appellant used the names: Roger, Bori, and Candido Lebron.

The jury also heard from Investigator Gillie, who took over Investigator Webb's duties assisting in the investigation of the case. Investigator Gillie testified that he worked on finding the other man "involved in this crime back in 1992." After Santana revealed during a FBI interview that appellant was the man involved in the crimes together with Cruz-Garcia, Investigator Gillie worked on locating appellant. Investigator Gillie testified that he located appellant in Georgia after several months of searching. He went to appellant's house and introduced himself but appellant did not "appear shocked" to see him; appellant told Investigator Gillie that he knew "what this is about. It's about that little boy a long time ago in Houston." Appellant agreed to be interviewed by Investigator Gillie. After the interview, appellant called his wife on his cell phone. Appellant's interview and phone call both were recorded. Investigator Gillie testified that appellant was then charged with capital murder and brought to Houston to stand trial.

Investigator Gillie testified that, while appellant's case was pending, Diana called to visit with him and Tise. According to Investigator Gillie, Diana would call whenever she was in Houston "to stop by and see how the case is going and say 'hi,' see if she needed to do anything," and he and Tise would accommodate her visit. During one visit

13

in 2012, Investigator Gillie decided to let Diana listen to the tape recording of the phone call appellant had made to his wife after his interview in Georgia because it was the first time law enforcement had a recording of appellant's voice. Investigator Gillie testified regarding how the tape recording was played for Diana and her reaction upon hearing the voice recording:

> [THE STATE:] Before she listened to it, did you give her any information at all about who she was going to hear?
>
> [GILLIE:] No, nothing like that at all.
>
> [THE STATE:] What were you trying to be careful of?
>
> [GILLIE:] We didn't want to be suggestive in any way. You know, I just told her I wanted her to listen to the voice and see if she recognized the voice as being a person that was involved that night that Angelo Garcia, Jr. was taken, if she recalled that voice. And I told her would she listen, to just listen to the voice, not really the content.
>
> [THE STATE:] Okay. Do you think she was expecting for the voice to all of sudden come on that moment on the computer?
>
> [GILLIE:] No. I don't think she was expecting it at all because of the way the conversation was going about the other case and we had asked her and then hit 'play' on the computer and she started -- as soon as he started talking --
>
> *         *         *
>
> [THE STATE:] But prior to playing the tape for Diana, did you say to her: We arrested this guy in Georgia and we want you to listen to his voice and see if this is the guy?
>
> [GILLIE:] No, not at all.
>
> [THE STATE:] You wouldn't have ever done that, would you?
>
> [GILLIE:] No.
>
> [THE STATE:] Okay. You just told her: We want you to listen to something, didn't tell her what it was going to be, and that you wanted to see if she recognized the voice?
>
> [GILLIE:] Yes, that's true.
>
> [THE STATE:] So, how did it happen that the tape was played or the CD

14

was played on the computer?

[GILLIE:] The CD was in, I just asked her to listen just a minute ago, she said she would. And getting it organized or getting ready to hit 'play' and hit 'play' and --

[THE STATE:] Do you think it took her off guard at first? Was she --

[GILLIE:] No, I don't think she was ready. Because she wasn't even looking that way at that time. She wasn't even looking, like she was looking to hear something. She was -- her sister was sitting there and I was sitting there. It wasn't like it was something she was ready for at all.

[THE STATE:] Okay. So, when you hit 'play,' what happened?

[GILLIE:] It was dramatic. She broke down and just went down and started crying. And she said: That's him, that's him.

[THE STATE:] After that happened, did it take a little while for her to calm down?

[GILLIE:] Yes. She was shaking. And it took a pretty good while to get her to calm down just so that we could talk to her. Because I had -- I needed to ask her some more stuff, but she was really upset.

[THE STATE:] And after she identified that voice, did you clarify with her which individual -- where she recognized that voice from?

[GILLIE:] Yes. As soon as she calmed down, I asked her, I said: When you say that's him, what do you mean that's him? And she said: That's him, the other guy that night, the tall guy that was in the room when Angelo was taken. And she was adamant about it.

[GILLIE:] Did she tell you she was sure?

[THE STATE:] She said she was absolutely positive.

During cross-examination, Investigator Gillie testified that Arturo never made "a positive identification for [appellant]." He also testified that no other voice recordings were played for Diana besides the three previously played during the investigation. Investigator Gillie testified that he listened to the voices and dialect of appellant as well as of Cruz-Garcia, Santana, and German; there were differences in the voices "in certain things" and "[n]one of them sounded like Tex-Mex."

Investigator Gillie also testified that he was careful not to play any recording of

appellant's interrogation for Diana; he played only the recording of appellant's phone call to his wife. He stated that the call started with greetings between appellant and his wife, and Diana "almost immediately" identified the voice. Investigator Gillie further testified that, when Arturo heard the recording of appellant's voice, Arturo "just couldn't remember" the voice and reminded Investigator Gillie that he "was being assaulted when that was happening" and then proceeded to show scars on his head from the beating.

Several law enforcement officers who were involved in the investigation of the case early on testified that Diana had described the first man who entered the apartment as a tall, dark-skinned man speaking with a foreign accent.

Sergeant James Devereaux, who was called to the apartment the night of September 30, 1992, testified that Diana had told him that night that "she got a good look at the first suspect, the tall masked man, but didn't get a chance to really see the second person." Diana also "described a foreign accent being spoken by that first man" who entered the apartment.

Sergeant C.E. Elliott, who was also called to the apartment the night of the crimes, testified that he only briefly spoke to Diana and that Diana described the suspects as dark-skinned Hispanics with a foreign accent. Sergeant Elliot understood that Diana was not describing "an African-American individual from the United States" but the suspects were "probably from South America, Cuba, Dominica [sic], Puerto Rico, that are not black Americans."

FBI Special Agent Eric L. Johnson, who was involved in the investigation of Angelo's kidnapping from its inception, testified that the "focus of [the] investigation was pretty much Hispanics [sic] males from other countries, Central America, with foreign accents." Agent Johnson agreed with appellant's trial counsel that Diana "state[d] very specific things about the person wearing the mask that comes in first." In

16

particular, Agent Johnson agreed that she stated the first person who entered her apartment "had purple lips, that the person had white -- their eyes were very, very white around the white part, it bulged out, and I can remember this person even though that person had a mask on."

Sergeant Swaim testified that, on October 6, 1992, he visited the apartment Cruz-Garcia and his wife had lived in before Cruz-Garcia fled Houston. Sergeant Swaim learned that a tall Hispanic male was staying at the apartment. At the apartment, a tall Hispanic male answered the door and introduced himself as Candido Lebron. The man said he was from St. Croix and gave Sergeant Swaim a St. Croix birth certificate with the name Candido Lebron. When the man could not answer questions about his birth certificate and could not state his parents' names listed on the birth certificate, Sergeant Swaim asked the man to accompany him to the police station to be interviewed by a Spanish-speaking officer. The man went with Sergeant Swaim to the police station; he was interviewed and photographed there at that time.

At trial, Investigator Swaim identified State exhibit 84 as being a photo of the Hispanic male whom he encountered at Cruz-Garcia's apartment and who identified himself as Candido Lebron. Investigator Swaim testified that the photo was taken on October 6, 1992, six days after Angelo was abducted. He identified appellant in court as "an older version of the individual that [he] interviewed on that day."

FBI Special Agent Michael Hochrein testified that he and another agent visited Santana in a Pennsylvania prison in May 2011 to conduct an interview and determine if Santana knew anything about Angelo's abduction. At first, Santana denied knowing about Angelo's kidnapping and murder but then he admitted being with Cruz-Garcia and appellant the night Angelo was taken from his home and killed in 1992. Agent Hochrein testified that Santana revealed he had gone with Cruz-Garcia and appellant to Diana and Arturo's apartment. Santana described in detail how he, Cruz-Garcia, and

17

appellant were involved in the kidnapping and murder of Angelo that night.

The jury also heard Santana's testimony at trial. Santana testified that he was born in the Dominican Republic but left the country to go to Puerto Rico when he was about 18 years old because it is easier to immigrate to the United States from there. He testified that he and Cruz-Garcia came to the United States to sell drugs. At first, the two were partners but then Cruz-Garcia took control of the business; he also had a lot of control over Santana.

According to Santana, he became friends with appellant in early 1992. He knew appellant as Rogelio or Bory. Santana explained that "Bory" means "from Puerto Rico" and Santana believed appellant to be from Puerto Rico. Santana identified appellant in court as the man he knew as Bory or Rogelio but stated that appellant was "big and tall and much more muscular" back in 1992. Santana also identified appellant in a photograph admitted as State exhibit 34-B and agreed that "that is the way Bory or Roger looked back in 1992." Santana testified that appellant was "certainly bigger and taller" than he and Cruz-Garcia were.

Cruz-Garcia also became friends with appellant, and the three men "started going everywhere" together. Santana testified that he, Cruz-Garcia, and appellant drove to Diana's and Arturo's apartment on September 30, 1992, because Cruz-Garcia wanted to "look for his drugs and his money." Cruz-Garcia parked his car in "the back dark part of the apartments, a small street that was behind the apartments with not much traffic." Cruz-Garcia instructed Santana to wait in the car while he and appellant went to Diana's and Arturo's apartment, which was not visible from where Cruz-Garcia had parked his car. Cruz-Garcia was armed with a pistol and appellant carried a pocket knife when they went to the apartment; both men wore masks.

Santana sat in the car and waited while appellant and Cruz-Garcia were in Diana and Arturo's apartment for about 20 to 30 minutes. When Cruz-Garcia returned to the

18

car, Santana saw him carrying Diana's son Angelo in his arms. Santana asked him why he brought Angelo with him. He responded that Angelo saw his face and recognized him; he then handed Santana the child. Cruz-Garcia also told Santana that he had sexually assaulted Angelo's mother. Appellant came back to the car, and Cruz-Garcia drove Santana, appellant, and Angelo to a wooded area in Baytown.

Cruz-Garcia stopped the car and told appellant: "Bory, you already know what you have to do." Santana saw appellant take Angelo out of the car; Santana walked away from the car feeling ill. Cruz-Garcia stayed at the front of the car holding his pistol. Appellant took Angelo to the back of the car; Santana could not see appellant and Angelo but he heard Angelo moan. Santana walked to the back of the car and saw Angelo laying face-up on the ground "full of blood." Cruz-Garcia ordered Santana and appellant to put the child's body in the car, and they complied. Cruz-Garcia then drove back toward the city. On the way, Cruz-Garcia stopped by a river and ordered appellant and Santana to throw Angelo's body in the water. Cruz-Garcia also ordered appellant and Santana to sink Angelo's body in the water, so they looked for rocks and placed them on Angelo's body until it sank.

As they continued driving toward Houston, Cruz-Garcia handed Santana the "knife that was used to kill the little boy" and told Santana to "dump it out to the freeway." Thereafter, two of the car's tires blew up. The three men managed to get to a hotel in Pasadena where Cruz-Garcia called Bienviendo Melo because Cruz-Garcia kept a second car at Melo's home. After picking up Cruz-Garcia's car from Melo's home, appellant stayed at a hotel and Cruz-Garcia and Santana drove to Cruz-Garcia's apartment. The next day, Cruz-Garcia and Santana asked a friend to repair the car with the blown-out tires; they then washed the car and sold it. Santana testified that Cruz-Garcia sold the car for cash and bought a ticket to leave the country. Santana drove Cruz-Garcia to the airport, and he left the country. Santana never told police about

19

Angelo's kidnapping and murder until 2011 when two FBI agents interviewed him in a Pennsylvania prison.

Linda Hernandez, who was Melo's girlfriend at the time of the murder, testified at trial that Cruz-Garcia called her home at about 1:30 a.m. on October 1, 1992, to speak to Melo. Hernandez testified that Cruz-Garcia asked Melo to pick him up in the car Cruz-Garcia had lent Melo but Melo refused and told Cruz-Garcia to pick up the car himself. According to Hernandez, Cruz-Garcia and Santana arrived at her home around 2:30 a.m. by taxi. Santana appeared very nervous but Cruz-Garcia was calm. The two men drove off in the car. Hernandez testified that Santana returned the car to Melo a few days later; the car was dirty "[l]ike it's been to the beach."

The jury also heard testimony from three experts, Dr. David Lisak, Prof. Phillip Lyons, and Dr. Al Yonovitz, who opined regarding identification procedures, voice identification and memory decay, and how memories of traumatic events are stored.

After deliberation, the jury found appellant guilty of the capital murder of Angelo, and the trial court assessed appellant's punishment at life imprisonment. Appellant timely filed an appeal.

ANALYSIS

I. Identification

In his first issue, appellant argues that the "trial court reversibly erred by allowing (1) testimony about [Diana]'s pre-trial voice identification of" appellant because Diana identified appellant's voice "under suggestive circumstances that unquestionably encouraged [Diana] to identify the voice she heard as that of the only remaining unknown suspect from a twenty-year-old offense;" and (2) Diana's "in-trial identification of [appellant] in photograph and in person" because Diana identified appellant at trial "for the first time only after knowing that the voice she identified under

20

unduly suggestive circumstances belonged to" appellant, and "this identification is inseparable from the unduly suggestive pre-trial voice identification."

## A.    Pre-Trial Identification

We begin by addressing appellant's contention that the trial court should not have admitted any testimony regarding Diana's pre-trial voice identification of appellant because Diana identified appellant's voice "under suggestive circumstances that unquestionably encouraged" her to identify the voice she was played while visiting with Tise and Investigator Gillie as the voice of the first man who came into her apartment on September 30, 1992.  Appellant correctly contends that he preserved his argument for appeal.  Based on the arguments presented at the hearing on appellant's motion to suppress, the trial court was asked to suppress Diana's pre-trial and in-court identification of appellant's voice; and the trial court denied appellant's motion to suppress.  *See Livingston v. State*, 739 S.W.2d 311, 334 (Tex. Crim. App. 1987) ("It is settled that when a pre-trial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error.").

We thus consider whether the trial court should have suppressed testimony regarding Diana's pre-trial identification of appellant's voice because it resulted from an unduly suggestive identification procedure.

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion.  *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Mendoza v. State*, 443 S.W.3d 360, 362 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We afford almost total deference to a trial court's determination of historical facts. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).  The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  *Id.*; *Adams v. State*, 397 S.W.3d 760, 763 (Tex. App.—Houston [14th Dist.]

21

2013, no pet.). The trial court is entitled to believe or disbelieve all or part of a witness's testimony, even if that testimony is uncontroverted, because it has the opportunity to observe the witness's demeanor and appearance. *Valtierra*, 310 S.W.3d at 447.

If the trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and determine whether the evidence supports these factual findings. *Id*.; *State v. Smith*, 335 S.W.3d 706, 714 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

We review a trial court's application of the law to the facts *de novo*. *Mendoza*, 443 S.W.3d at 362; *Adams*, 397 S.W.3d at 763; *see Valtierra*, 310 S.W.3d at 447. We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra*, 310 S.W.3d at 447-48; *Mendoza*, 443 S.W.3d at 362; *Adams*, 397 S.W.3d at 763.

"[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). To determine the admissibility of a pretrial identification, we use a two-step analysis asking (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Santos v. State*, 116 S.W.3d 447, 455 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972). An analysis under these steps requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Conner*, 67 S.W.3d at 200; *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). A defendant must prove the pre-trial identification is unreliable by proving both elements by clear and convincing evidence. *See Santos*, 116 S.W.3d at

22

451.

If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, then the identification testimony is admissible. *Santos*, 116 S.W.3d at 451, 455-56; *see Neil*, 409 U.S. at 199. Therefore, even if the pretrial procedure is found to be impermissibly suggestive, identification testimony nevertheless is admissible if the totality of the circumstances shows no substantial likelihood of irreparable misidentification. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Adams*, 397 S.W.3d at 764. If the totality of the circumstances indicates that a substantial likelihood of misidentification exists, then admission of the identification of the defendant amounts to a denial of due process. *See Neil*, 409 U.S. at 198-99; *Adams*, 397 S.W.3d at 764.

The analysis of an identification of a voice differs somewhat from that of an identification by sight, but the standards used to validate a visual identification are equally applicable. *See Davis v. State*, 180 S.W.3d 277, 283 (Tex. App.—Texarkana 2005, no pet.) (analyzing admissibility of voice identification); *see also Williams v. State*, 116 S.W.3d 788, 792 (Tex. Crim. App. 2003) ("'while one's voice and handwriting are, of course, means of communication,' a voice or handwriting exemplar 'is an identifying physical characteristic'") (quoting *United States v. Dionisio*, 410 U.S. 1, 6-7 (1973)). Because the sole purpose of the use of the tape recording of appellant's voice was the same as the use of a photo of appellant would have been had Diana been asked to attempt an identification from appearance, we will apply the same types of strictures as are used in the more typical situation involving visual identification. *See Davis*, 180 S.W.3d at 282.

We first will determine whether the pretrial voice identification procedure in this case was impermissibly suggestive. Suggestiveness may arise from the manner in which a pretrial identification procedure was conducted. *Barley*, 906 S.W.2d at 33. For

23

example, a police officer may point out the suspect or suggest that a suspect is included in the line-up or photo spread. *Id.* An identification may be suggestive based on a single procedure or the cumulative effect of multiple procedures. *Id.*

Even if a pretrial identification procedure may have been suggestive, a defendant must establish by clear and convincing evidence that the procedure was impermissibly suggestive. *See Santos*, 116 S.W.3d at 451, 455-56. To be impermissibly suggestive, "the identification procedure utilized must in some way be so defective as to indicate or suggest the [individual whom] the witness is to identify." *See Ward v. State*, 474 S.W.2d 471, 475 (Tex. Crim. App. 1972). "Suggestiveness must be determined by the circumstances of each case." *Cantu v. State*, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987) (holding that showing a witness several photo spreads containing the same photo of defendant on different occasions was impermissibly suggestive).

At the suppression hearing, Investigator Webb testified that he played recordings of Cruz-Garcia's, Santana's, and German's voices for Diana at Tise's office after Cruz-Garcia had been charged with capital murder. At the time, law enforcement knew that Cruz-Garcia was the man who had sexually assaulted Diana and were looking for the other, yet unidentified, man "who did all the talking." Investigator Webb testified that he and Tise decided to play the three men's voice recordings for Diana to determine whether one of the three men "might be our unidentified person." Diana knew some of the men whose voices Investigator Webb had played; and evidence showed that Diana knew Cruz-Garcia "for a period of time." According to Investigator Webb, Diana did not identify any of the three voices he played for her as being the voice of the "man who did all the talking."

Investigator Gillie also testified at the suppression hearing, describing how the voice identification of appellant occurred and that Diana immediately and positively identified appellant's voice as being the voice of the first, "tall man that came into her

24

room that night" and who "was doing all the talking." Investigator Gillie testified that Diana came to Tise's office to talk about Cruz-Garcia's trial reset and discuss travel; Diana's visit was not "planned and she did not come down in order to hear a voice and I.D. it" nor was Diana "told that that was going to happen." According to Investigator Gillie, he and Tise decided during their visit with Diana to play a portion of appellant's recorded phone call to appellant's wife for Diana. Investigator Gillie testified regarding the instructions he gave Diana before playing the taped phone call for her and her immediate reaction upon hearing the recording as follows:

[THE STATE:] Prior to playing the statement, did you give [Diana] some instructions?

[GILLIE:] Yes.

[THE STATE:] And what were those?

[GILLIE:] To listen to the voice on the tape and not the contents and try and see if she recognized the sound of the voice and how it sounded and see if she recalled that.

[THE STATE:] And did you tell her that the voice may or may not have anything to do with the crime that she w[a]s the victim of all of those years ago?

[GILLIE:] Several times.

[THE STATE:] And did you explain to her she was under no obligation to pick anyone?

[GILLIE:] Absolutely.

[THE STATE:] Just if she recognized someone to let us know?

[GILLIE:] That, and if she didn't recognize someone to let us know.

[THE STATE:] And if she recognized someone from the events that happened all those years ago?

[GILLIE:] Yes.

[THE STATE:] Okay. And then you played the audio of . . . the phone call, correct?

[GILLIE:] Yes, ma'am.

[THE STATE:] And you said that she reacted. How strong a reaction was

25

it?

[GILLIE:]  It was hard for her.  She was noticeably heartbroken.  You know, it looked like there for a minute she almost stopped breathing.

[THE STATE:]  It was very emotional?

[GILLIE:]  It was very emotional.  I mean . . .

[THE STATE:]  She started crying?

[GILLIE:]  Yes.

[THE STATE:]  And she immediately said that was the voice of the tall man that came into her room that night?

[GILLIE:]  Yes.

[THE STATE:]  And did she express to you how certain she was?

[GILLIE:]  She said she was absolutely positive he was the one that was doing all the talking.

[THE STATE:]  When he came in the room?

[GILLIE:]  He was the one that did all the talking.

[THE STATE:]  And is your understanding of the offense that -- from reviewing the report of the offense that one of the individuals that came into her room that night did all the talking and the other was silent?

[GILLIE:]  Yes.

Investigator Gillie also testified that, although recordings of Cruz-Garcia's, Santana's, and German's voices were played for Diana during the investigation in the same way appellant's voice recording was played for her, Diana did not identify any of the three men's voices as belonging to the first man who entered her apartment and "who did all the talking."

Appellant presented testimony from criminal justice professor Dr. Phillip Lyons. Dr. Lyons testified as an "expert on identification procedures, and specifically photographic lineups and eyewitness identification."  Dr. Lyons testified that he has been "involved in assisting law enforcement agencies identify appropriate identification procedures."  He has worked with the Law Enforcement Management Institute of Texas

on developing a proposed model identification policy that law enforcement could employ, but the legislature did not adopt the policy. The model identification policy strongly discourages showups and "recommend[s] photographic arrays as preferential to live lineups." To minimize suggestibility, the model policy proposes that an independent officer should present sequential photos to a witness for identification instead of a photo array.

Dr. Lyons testified that he has not been "involved with voice recognition identification of any means" and that everything he learned about voice identification was based on his study of a few published articles and studies on voice recognition. He opined that concerns of suggestibility are equally present in eyewitness and voice identifications. He agreed that "just like trying your best to get to sequential [photo] identification with an unbiased officer, the same thing would be apparently applicable to voice recognition." Dr. Lyons also agreed that "when a person has been given an opportunity to hear multiple voices that would be a less suggestive technique;" it would be the "encouraged" approach which "would be less likely to lead to misidentification."

Dr. Lyons was asked by appellant if "the time between the exposure to the voices [has] any effect? For example, if you came in and you were asked to hear three or four or five voices on one day right after each other, versus one day you hear one voice, three or four days later you hear another voice, would that change the factors regarding suggestibility, that method?" Dr. Lyons responded he was "not aware of any studies that have compared those two different approaches." He stated: "What you just described to me doesn't really sound like a lineup, though. It sounds like a number of sequential individual presentations."

In denying appellant's motion to suppress, the trial court rejected appellant's argument that the pre-trial identification procedure was impermissibly suggestive because (1) Investigator Gillie never suggested to Diana that the voice played was that

27

of her assailant; (2) other voice samples had been previously played for Diana; and (3) Diana did not identify any of the previously played voices as being the voice of her assailant.

Appellant argues that the "use of a single voice for identification played twenty years after the offense suggested to [Diana] that the voice belonged to the only remaining unknown suspect in case." Appellant argues that playing a single voice is as suggestive as showing a single photo because there is no ability to compare the played voice with other similar voices. According to appellant, neither Tise nor Investigator Gillie "successfully diminished the suggestive context in which [Diana] heard only [appellant]'s voice as a suspect for identification purposes twenty years after the offense" because they did not play a voice lineup for Diana. Appellant also argues that, although Diana was played voice recordings of Cruz-Garcia, Santana, and German before being played appellant's voice, Diana knew the three men, and appellant's voice was the only unfamiliar voice that was played for Diana.

Contrary to appellant's assertion, the evidence presented at the suppression hearing does not show that Diana "personally knew" all three men whose voices she did not identify as being the voice of the "man who did all the talking." The evidence presented at the hearing shows that Diana knew Cruz-Garcia "for a period of time." The evidence does not support appellant's contention that his voice was the only "unfamiliar voice" played for Diana.

Appellant cites *Davis v. State* as authority that playing a witness a single voice recording constitutes an impermissibly suggestive identification procedure. *See Davis*, 180 S.W.3d at 281-83. *Davis* is distinguishable. In *Davis*, the police played only one voice recording for the complainant during the entire investigation. *Id*. at 281. Here, Diana was played voice recordings of three different men during the investigation, albeit not on the same day as she was played the recording of appellant's voice.

28

Further, no one suggested to Diana that appellant's voice recording was that of a suspect; nor was she told or encouraged to identify or "pick anyone" after listening to appellant's voice recording. Contrary to appellant's assertion, the evidence does not establish that Diana "was expecting to hear the voice of the tall man." Instead, evidence establishes that Diana did not expect to hear any voice recording during her visit with Tise and Investigator Gillie; Diana was at Tise's office to discuss the fact that Cruz-Garcia's trial had been reset, "discuss travel," and get an update on Cruz-Garcia's case in general.

Playing appellant's voice recording for Diana would no more have suggested that the "voice belonged to the only remaining unknown suspect in the case" than when she was played recordings of Cruz-Garcia's, Santana's, and German's voices. Appellant's argument that, "[w]ithout a [voice] lineup for comparison, [Diana] understandably latched onto this voice as belonging to the only remaining unknown suspect," is not persuasive. This is so because Diana knew Cruz-Garcia had been charged with capital murder, and that law enforcement was trying to find the "only remaining unknown suspect" when she heard recordings of Cruz-Garcia's, Santana's, and German's voices; yet, Diana did not identify any of the three voices as being the voice of the man "who did all the talking."

Based on the record before us and considering the totality of the circumstances, we conclude that the pre-trial identification procedure was suggestive but not impermissibly so. Even if appellant had proven by clear and convincing evidence that the pre-trial voice identification procedure used by law enforcement was unduly suggestive, we cannot conclude that it gave rise to a substantial likelihood of irreparable misidentification so as to make the identification testimony inadmissible.

In determining whether an impermissibly suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification, we weigh the

29

following factors: (1) the witness's opportunity to hear the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal's voice; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Neil*, 409 U.S. at 199; *Santos*, 116 S.W.3d at 453, 455-56. Because these factors are issues of historical fact, we weigh them deferentially in a light favorable to the trial court's ruling. *See Ibarra*, 11 S.W.3d at 195-96; *Adams*, 397 S.W.3d at 764. We then weigh the factors, viewed in this light, *de novo* against the "corrupting effect" of the suggestive pretrial identification procedure. *See Ibarra*, 11 S.W.3d at 195-96; *Adams*, 397 S.W.3d at 764.

At the suppression hearing, the trial court heard testimony from several experts and police investigators relevant to the reliability of Diana's pre-trial identification of appellant's voice. Appellant asked his expert on eyewitness identification procedures, Dr. Lyons, to opine on a person's ability to "recognize voices over a period of time where there has been any time lapse." Dr. Lyons stated that "there is a decay effect. And as more time goes by, people do accurately identify at lower rates than if the attempted identification is sooner after the -- sooner after the voice is heard." Appellant's counsel asked: "Where a person is speaking Spanish, but a person comes from a different location, is there any difficulty in recognizing the voices where the accent is different?" Dr. Lyons answered that he was "not aware of any studies that have been done that have looked at regional accent or dialects, only at different languages."

On cross-examination, Dr. Lyons stated that he has no direct experience in the area of voice identification, and what he has learned about voice identifications was the "result of doing research and studying scholarly articles in preparation for [his] testimony." Dr. Lyons also stated that, at most, three articles were relevant to this case

and the issue of the effect of a time lapse on a voice identification. None of the articles was based on studies that "involved a situation where an individual actually went through a real-life traumatic event, something that would stick with you for a long time, and test their memory as to that voice and their ability to I.D. it after a long period of time."

Dr. Lyons stated that in the past 20 years there has been a "tremendous amount of research" conducted in the area of "trauma and the impact it has on attention and processing and encoding" as well as how the brain stores memories of traumatic events. Dr. Lyons testified that research has shown that memories of traumatic events "can be extremely durable over time." He testified that he was "familiar with the line of research that talks about how during a traumatic event sometimes sensory memories, like the things that you hear, the things that you feel, are the things that are most likely to revisit you over a period of years as you relive that trauma." He admitted that it is a different scenario to ask someone to remember a voice after hearing "something that's meaningless to them, doesn't have a big impact on their life" versus "the memory of a traumatic event that you might relive over and over in your mind for years."

Further, Dr. Lyons agreed that "if a person hears someone who speaks Spanish and English and they understand both Spanish and English but there is a dialect that's a little different, there are no studies talking about the accuracy of that kind of identification." Dr. Lyons testified that he is not aware of any studies that "address the issue of regional dialect." Finally, Dr. Lyons testified that studies show that a person who is blindfolded or whose face is covered is "much more likely to remember that voice . . . because [the] primary focus is on that voice rather than the visual."

Appellant also called Dr. Al Yonovitz, a professor of hearing and speech, to testify as an expert on voice identification. Dr. Yonovitz testified that "on voice identification specifically for memory, there is a smaller set of research papers and they

31

all tend to agree with each other." He testified that memory decay is a concern in voice identifications and "all of the studies after three months will show that a person is just guessing and their chances of being correct are below chance level, after only three months." According to Dr. Yonovitz, "there have been studies that suggest that when a person hears a voice and then there's a lapse of time before they're asked to identify that voice, that there is a large percentage of misidentification in those types of cases."

On cross-examination, Dr. Yonovitz stated that he has testified many times regarding decay of memory for voices rather than voice identification. He agreed that the "body of research that has been done in the area of memory and auditory identification is very limited." He testified that the studies he relied on to support his testimony regarding memory decay for voices were conducted with random volunteers and students in a non-traumatic, sterile research environment, in which the volunteers were read a random passage and later asked to identify the voice of the speaker. Dr. Yonovitz testified that there is no research regarding whether hearing a voice under distressing circumstances has any effect on a listener's memory.

Dr. Yonovitz testified that there is no research involving individuals who have experienced a traumatic event and made voice identifications. He stated that he is "not at all familiar with the research that's been done in the area of how the human mind stores sensory memories from a traumatic event [in] another area of the brain." He also stated that he has "never testified or been qualified as an expert on the issue of memory when it comes to auditory identification;" he "never testified on issues in memory for witnesses, only on matching of voices from an unknown to a known."

The State called its own expert, Dr. Phillip Lisak. Dr. Lisak is a clinical psychologist who specializes in the area of trauma and violence and who "interviewed, evaluated, and treated hundreds of individuals who have been traumatized," including sexual assault victims. He opined that "[m]emory is dramatically affected by traumatic

experience. And that is something that we have known from clinical work over decades, but we now understand much more thoroughly because of the advances in neuroscience in the last 15 to 20 years. We understand how the brain encodes those experiences and also then how people either recall them or the experience[s] sometimes actually recall themselves."

Clarifying that he is not an expert in auditory recall or voice recognition specifically, Dr. Lisak testified that based on knowledge of how "the brain encodes traumatic experiences very differently, that the recall of those experiences is very different, actually involves different parts of the brain. So, I would say as a researcher that anybody who is studying anything having to do with recall, if it involves a traumatic experience, must take that into consideration because it is very, very -- it's going to be very different from recall of ordinary events."

Dr. Lisak explained in detail how traumatic events affect a person's memory of those events. He provided "examples of memories that have been triggered many, many years after the initial event that caused the trauma in the first place." He also discussed examples of individuals he treated who had a triggering response from a memory dating back 20 to 30 years. This occurs "because the memories that we have of sensory experiences after a traumatic event or during the course of a traumatic event are stored differently than other types of memories."

On cross-examination, Dr. Lisak stated that he has no opinion regarding whether the "decayative memory process affects the ability of a person to make an accurate identification." During re-direct examination, Dr. Lisak explained that "what we have extensive clinical evidence for is the durability of these fragmented sensory memories that trauma survivors are almost universally left with. There is -- there is not research that I know of that has studied . . . how long do these memories endure, is there a decay process. I'm not aware of any research that's been done on those types of traumatic,

fragmented sensory memories." Dr. Lisak also testified that, in his clinical experience, he has seen examples of auditory memories lasting "well beyond 20 years."

The trial court also heard testimony from Officer U.P. Hernandez, who had been involved in the investigation of the case since October 1, 1992, and had interviewed Diana at the time. Officer Hernandez testified that Diana described the man "she heard that night in the bedroom, who was doing all the talking" as being tall, about 6-foot, and muscular with almost purple lips. He also testified that Diana claimed from the beginning — the morning after the incident — that she could identify the man's voice if she heard it again.

She told Officer Hernandez that the man spoke English and Spanish with a foreign accent — not "the normal Spanish that you hear from individuals who have immigrated here from Mexico." She meant that the man did not speak "the kind of Spanish" that Texans like Diana or Officer Hernandez speak, which is "more plain, there is no accent to it." Officer Hernandez testified that he knew what Diana meant when she said the man was speaking with a foreign accent; "[s]he was talking about someone that could either be from the Dominican Republic, could have been a Colombian, or a Puerto Rican." Officer Hernandez stated that, in his experience, individuals from "central American countries, especially the Islands, speak Spanish in a very different way than" he speaks Spanish.

Investigator Webb testified that he and Tise played voice recordings of Cruz-Garcia, Santana, and Leonardo German for Diana during the investigation. According to Investigator Webb, Diana did not identify any of the three men's voices played for her as being the voice of the "man who did all the talking."

Investigator Gillie confirmed that Diana was played recordings of Cruz-Garcia's, Santana's, and German's voices but did not identify any of the voices as being the voice of the attacker. Investigator Gillie recalled that Cruz-Garcia and Santana were from the

34

Dominican Republic; and German was from St. Croix and spoke Spanish with a "little dialect." Investigator Gillie testified that Diana had provided a description of the voice of the "man who did all the talking" before she was played appellant's voice and identified it. He testified that Diana had stated the voice "was distinct. Not like our -- I can just say it like this, Tex Mex. It's not like that kind of Spanish. It was like from the Islands, Honduras, or Puerto Rico or something like that kind of Spanish. . . . It's just different than Tex Mex . . . ."

According to Investigator Gillie, Diana was played a recording of a phone call appellant had made to his wife and almost immediately identified appellant's voice as that of the man "who did all the talking." Investigator Gillie testified that, "[a]fter playing a very short amount of the" recording, Diana "just put her hands in her face" and said: "That's him, that's him." Diana started crying; she was "noticeably heartbroken;" "it looked like there for a minute she almost stopped breathing;" and "she was very emotional." Investigator Gillie testified that Diana "said she was absolutely positive he was the one that was doing all the talking."

At the suppression hearing, appellant began his argument to the trial court by stating: "[W]hat we're actually trying to do today is determine a two-prong process. I'm asking this Court to be the gatekeeper as to whether or not the method that was used in this particular identification was suggestive and that it was too long in duration to be accurate." After spending a considerable amount of time arguing that Diana's identification of appellant's voice is inadmissible because the pre-trial identification procedure used by law enforcement was impermissibly suggestive, appellant only briefly addressed the second prong — whether the allegedly impermissibly suggestive identification procedure gave rise to a substantial likelihood of misidentification — stating:

The second part of the case, Judge, in all of the cases, including

35

*Davis*,[2] time becomes a relevant factor on whether or not that court should allow the identification to come in. All of them -- some of them say eight months, some of them say one year, some of them -- but they all say the same -- there is no court that under the circumstances like it is today, 20 years later, that that's going to come in.

In fact, they all say it's the [sic] suspect after a shorter period of time. The longest that I can come up with, I think, was a year-and-a-half.

Except for the time factor, appellant's argument did not address any of the other four factors the court has to consider in determining whether a pre-trial procedure used by law enforcement gave rise to a very substantial likelihood of misidentification.

In denying appellant's motion to suppress, the trial court concluded that the "totality of circumstances reveals that there was no substantial likelihood of misidentification" because (1) Diana had an "adequate opportunity to listen to the assailant at the time of the offense;" (2) Diana's "home [was] broken into, her son was kidnapped, and she was allegedly sexually assaulted during the time she heard one assailant speak;" (3) Diana said that "she could identify the assailant's voice at an interview close in time to the alleged offense and that she had paid enough attention to describe the assailant's voice, the dialect, or a language peculiarity;" (4) when Diana was played a recording of appellant's voice, she was "very emotional at the time she heard the voice of the assailant, that she cried, and her I.D. was positive that that voice was the voice of her assailant;" and (5) any concern that the "extended time between the crime and the playing of the voice exemplar to Diana" would render Diana's identification unreliable is "diminished due to the testimony of the expert that was put on by the State, explaining that, giving a reasonable explanation."

Appellant contends that the first two factors addressing likelihood of irreparable misidentification — the witness's opportunity to hear the criminal at the time of the crime and the witness's degree of attention — weigh against admitting evidence of

---

²  *See Davis v. State*, 180 S.W.3d 277 (Tex. App.—Texarkana 2005, no pet.).

36

Diana's identification of appellant's voice because her "identification is based on a few phrases that she heard spoken to her husband twenty years ago."   We disagree.

The evidence presented at the motion to suppress hearing supports the trial court's finding that Diana had (1) "an adequate opportunity to listen to the assailant at the time of the offense, that according to Officers, . . . her home [was] broken into, her son was kidnapped, and she was allegedly sexually assaulted during the time she heard one assailant speak;" and (2) "paid enough attention to describe the assailant's voice, the dialect, or a language peculiarity at an interview that was made close in time to the alleged commission of the offense."

Investigator Gillie testified that (1) Diana was "the victim of a rape on the same night as her child being abducted;" (2) based on his review of the offense report, "one of the individuals that came into her room that night did all the talking and the other was silent;" and (3) Diana described the voice of the man who "did all the talking."  Officer Hernandez testified that Diana made "clear to [him] during [his] conversations with her" that one of the men who came into her bedroom the night her son was abducted "did all the talking."  She gave a description of his voice and stated from the beginning of the investigation that she could identify the man's voice.  Investigator Webb testified that Diana "had always said" that two men were involved in the crime, one was the "rapist" and the other man "who was in the room and did all the talking during the incident." There is no evidence that Diana was not attentive or that her attention was distracted. There is no evidence that Diana heard only "a few phrases" spoken to her husband that night; nor is there any evidence that Diana did not have an adequate opportunity to hear appellant's voice during the time she was being raped by Cruz-Garcia and her son abducted.

Regarding the third factor — the accuracy of the witness's prior description of the criminal's voice — appellant contends that Diana's "vague description does not provide

37

sufficient detail to justify allowing any testimony about" Diana's pre-trial identification. Appellant contends that Diana "g[a]ve officers a general description of the tall man's accent as 'some sort of a [non-Mexican] foreign accent.'"

The evidence supports the trial court's determination that Diana "describe[d] the assailant's voice, the dialect, or a language particularity." Officer Hernandez testified Diana told him that the man "who did all the talking" spoke English and Spanish with a foreign accent and not "the normal Spanish that you hear from individuals who have immigrated here from Mexico." Officer Hernandez stated Diana meant that the man did not speak "the kind of Spanish" that Texans speak, which is "more plain, there is no accent to it." He stated that he knew what Diana meant when she said the man was speaking with a foreign accent; "[s]he was talking about someone that could either be from the Dominican Republic, could have been a Colombian, or a Puerto Rican."

Investigator Gillie confirmed that Diana had described the voice as "distinct. Not like . . . Tex Mex. . . . It was like from the Islands, Honduras, or Puerto Rico or something like that kind of Spanish. . . . different than Tex Mex." Further, the evidence shows that Diana never gave an inaccurate description of appellant's voice, even if it was not very precise and detailed.

With regard to the fourth factor — the level of certainty demonstrated by the witness at the confrontation — the evidence supports the trial court's determination that Diana's reaction was "very emotional at the time she heard the voice of the assailant, that she cried, and her I.D. was positive that the voice was the voice of her assailant." And appellant acknowledges in his brief that Diana positively identified appellant's voice.

Investigator Gillie testified that Diana almost immediately upon hearing appellant's voice identified it as that of the man "who did all the talking." Investigator Gillie testified that, when Diana heard appellant's voice, she started crying; was

38

"noticeably heartbroken;" "almost stopped breathing;" "was very emotional;" and stated that "she was absolutely positive he was the one that was doing all the talking." The evidence establishes that a high degree of certainty surrounded Diana's identification of appellant's voice at the time she was confronted with his voice. We also note that Diana never identified anyone else as the man "who did all the talking."

With regard to the fifth factor — the length of time between the crime and the confrontation — appellant argues that, "[s]tanding alone, the 20 years time lapse between the offense and [Diana]'s hearing of the lone voice is sufficient to demonstrate the substantial likelihood of irreparable misidentification." We decline appellant's invitation, unsupported by authority, to create a bright-line length of time at which all of the other factors are rendered immaterial as a matter of law. Moreover, appellant's urging that the passage of time is dispositive ignores expert witness testimony about memory created by traumatic events that the trial court was entitled to credit.

The State presented testimony from Dr. Lisak regarding the durability of memories created by traumatic events. Dr. Lisak explained that "[m]emory is dramatically affected by traumatic experience." He also explained how "the brain encodes traumatic experiences very differently" from ordinary events and that the recall of traumatic experiences is very different and involves different parts of the brain, so that it is "very different from recall of ordinary events." Dr. Lisak explained in detail how traumatic events affect a person's memory of those events. He provided "examples of memories that have been triggered many, many years after the initial event that caused the trauma." He testified that there is extensive clinical evidence about the durability of sensory memories, including "auditory experiences coming from sounds" that "trauma survivors are almost universally left with." Dr. Lisak also testified that he has seen in his clinical experience examples of auditory memories durable "well beyond 20 years."

Additionally, appellant's expert, Dr. Lyons, acknowledged that research has shown that memories of traumatic events "can be extremely durable over time." Further, appellant's expert, Dr. Yonovitz, admitted that the studies he relied on to support his testimony that memory of voices decays over time were conducted with volunteers in a non-traumatic, sterile research environment.

In light of the experts' testimony at the suppression hearing, we cannot agree with appellant that the passage of 20 years between the crime and Diana's identification, although a significantly long period of time, "is sufficient to demonstrate the substantial likelihood of irreparable misidentification" or weighs against admitting evidence of Diana's identification of appellant's voice.

The evidence supports the trial court's determination that concern about the "extended time between the crime and the playing of the voice exemplar to Diana" is "diminished due to the testimony of the expert that was put on by the State, explaining that, giving a reasonable explanation."

Weighing the evidence of reliability against the pre-trial identification procedure used in this case, the procedure did not give rise to a very substantial likelihood of irreparable misidentification so as to deny appellant due process, even if it was unduly suggestive. Appellant did not establish by clear and convincing evidence that Diana's pre-trial identification of appellant's voice was inadmissible. Accordingly, the trial court did not abuse its discretion in allowing testimony about Diana's pre-trial identification. *See Davis*, 180 S.W.3d at 283-85 (trial court did not abuse its discretion by denying appellant's motion to suppress witness's identification of appellant's voice even though only his voice was played for witness during the investigation).

## B. In-Trial Identification

We now turn to appellant's argument that the trial court reversibly erred by allowing Diana to make an in-court identification of appellant "in photograph and in

person" because the in-court identification was "tainted by the unduly suggestive pre-trial identification of [appellant]." Appellant contends that his argument is preserved for review on appeal because he filed a motion to suppress and objected at trial. We disagree.

Appellant did not ask the trial court to suppress Diana's in-court identification of him by photograph or in person, nor did appellant object at trial to the in-court identification arguing that it is inadmissible because it is "tainted by an unduly suggestive pre-trial identification [procedure]" as he now argues on appeal.

At the suppression hearing, all the arguments focused exclusively on Diana's identification of appellant's voice. Appellant never mentioned any identification other than by voice, and the trial court ruled only on the admissibility of the voice identification: "The defendant's motion to suppress the in-court identification of the defendant, the voice identification, is denied."

During trial and before the State called Diana to the stand, the following exchange occurred. This exchange confirms that appellant previously had complained about only the admission of a voice identification. Appellant agreed to the State asking Diana whether she could identify appellant in-court based on a 20-year-old photograph of appellant:

> (Open court, defendant present, no jury)
>
> THE COURT: I'm listening.
>
> [TRIAL COUNSEL]: Judge, I've just been shown an exhibit that the State wants to use in an identification process by Diana. Of course, we have the main issue of in-court identification from the voice recognition I.D. Now she's cut out a mask --
>
>       \*            \*            \*
>
> [TRIAL COUNSEL]: She's shown me this picture. She wants to take the picture of my client that was taken near the time of this incident and put a mask over it and see if she can identify that. I'd object that it's been 20-

41

something years and it would be suggestive and --

[THE STATE]: Well, I mean, in an ordinary case, 20 years or 5 years, whatever, however long it would be, the witness could be on the witness stand and be asked to point the defendant out in the courtroom. And that happens in every trial, in every case.

THE COURT: You want him to try on the mask? I don't think it's appropriate to necessarily to put a mask over a picture.

[THE STATE]: Well, defense counsel has brought up in his opening statement that she said she could identify him wearing a mask. She could -- if she had seen his entire face, I would be asking her in court: Can you identify the person, and that would not be suggestive. And it is not suggestive in any trial, even though he's sitting over there at counsel table and -- I mean, that's what we do.

THE COURT: Do we have the mask that was worn?

[THE STATE]: We don't have a mask, but it's a cut-out of a mask that would be over his face that shows his eyes and part of his mouth that would be exposed. As part of her description of him, she describes the eyes and she describes the mouth.

THE COURT: Why can't she -- I'm inclined to agree with defense counsel, that --

[THE STATE]: Well --

THE COURT: It's almost like a reenactment. I mean, you don't have the actual mask. And if you had the actual mask, I'd probably allow you to require him to stand there and put on the actual mask, but if we don't have the actual mask --

[THE STATE]: We know it was a ski mask where his eyes and his mouth were exposed. And this is a cut-out that exposes the eyes and mouth.

THE COURT: Well, can you ask her if she recognizes his eyes and his mouth? Have you already done this in front of her?

[THE STATE]: No. I didn't do it in front of her because I didn't want defense counsel to say that I had suggested --

THE COURT: I just think that it's like a reenactment. If she can identify his eyes and his mouth and she can look at them individually without looking at the whole face and say those look like the same person, that's fine, but I don't see how putting a drawn or imagined ski mask over a picture is going to be a valid -- I mean the way it falls on the face and

42

everything might be completely different.  I'm not going to allow that.

[THE STATE]:  Okay.

THE COURT:  But I will allow the question -- if she wants to look at his face and say:  Looking at his eyes, are those the eyes?  Looking at his mouth, is that the mouth?

                \*                \*                \*

THE COURT:  . . . I'm talking about while she is on the stand here, I would allow you to ask the question, if looking at him she recognizes his eyes and his mouth.

[THE STATE]:  Oh, I can't do it even from -- this is a picture of him back then. That's critical in this case.  Because I can show you the picture of him back then and he does not look the same.  So, it's very important that the picture she's looking at is one from 20 years ago.

THE COURT:  That's fair.  You can show her a picture and ask her from the picture of him back then if she recognizes the eyes or recognizes the mouth as being the same person.  I don't know what she would say, but I'm not going to let you superimpose a mask over that and then say:  Do you recognize this person. Okay.  I was misunderstanding a little bit what you were wanting to do versus --

[TRIAL COUNSEL]:  That's exactly what she was going to do.

[THE STATE]:  Yeah, that's what I was going to do.

[TRIAL COUNSEL]:  You weren't misunderstanding.

                \*                \*                \*

THE COURT:  Let's make sure that my ruling is clear.  I'm not going to let you --

[THE STATE]:  No. I understand.

THE COURT:  -- superimpose the mask over, but if you have the picture of what he looked like from back then and you want to ask her, based on that picture, if she can identify the defendant's eyes as being the eyes of the individual that is -- that was the assailant that night and the nose, she can do that, but I'm not going to let you superimpose a mask over that picture to do the same thing.  Does that make sense?

[THE STATE]:  I understand your ruling perfectly.

THE COURT:  Okay.  Do you still have any objection, Mr. Brown, on that?

[TRIAL COUNSEL]:  That was my objection, Judge, and you've made the ruling.

THE COURT:  I know.  Do you still have any objection to the picture itself and asking that?  I didn't think you did.

[TRIAL COUNSEL]:  No.

THE COURT:  Okay.  Very good.  Let's proceed.

During Diana's testimony, as the State showed Diana a 20-year-old photo of appellant, the following exchange occurred:

[THE STATE:]  I'm going to show you a photo marked State's Exhibit 101.  And I want you to cover up what parts of the face that you need to cover up to look at the eyes and the mouth.  And first, tell me if you recognize the eyes of this man.

[TRIAL COUNSEL]:  Let the record reflect we object to this in-court identification, Your Honor.

THE COURT:  The record will so reflect.

[DIANA:]  I do recognize his eyes.  I do recognize his lips.

[THE STATE:]  Do those eyes and lips look like the eyes and lips of the man that was the first man in the room that night?

[DIANA:]  Yes, ma'am. Yes.

[THE STATE:]  Have you ever been shown this photo before?

[DIANA:]  No, ma'am.

[THE STATE]:  Your Honor, at this time, I'm going to offer State's Exhibit 101.

[TRIAL COUNSEL]: Again, we'd object.  The reason being, the photo was available in 1992 and this is the first time that --

[THE STATE]:  I'll object to the speaking objection.

THE COURT:  Well, I'm going to sustain it as to relevance at this time, unless somebody can identify who that person is in that photo.

[THE STATE]:  Okay. . . .  Having seen that photo, do you see an individual in the room who looks like that?

[DIANA:]  Yes.

[THE STATE:]  And can you point him out for us, please?

44

[DIANA:]  Him (indicating).

[THE STATE:]  And can you describe him by an article of clothing?

[DIANA:]  What he's wearing right now?

[THE STATE:]  Yes.

[DIANA:]  He is wearing a light blue, grayish shirt, with a gray tie with lines in it.

[THE STATE:]  Your Honor, may the record reflect the witness has identified the defendant?

THE COURT:  The record will so reflect.

[THE STATE]:  At this time, I will offer State's Exhibit 101.

[TRIAL COUNSEL]:  We'll renew our objection.

THE COURT:  I'm still going to sustain his objection just as to relevance until we have someone that can testify who that is and when that photograph was taken.

[THE STATE]:  Yes, Your Honor.

THE COURT:  Thank you.  Please proceed.

Appellant failed to object to Diana's in-court identification of appellant "in photograph and in person" on the basis that the in-court identification was "tainted by the unduly suggestive pre-trial identification [procedure]."  Appellant's only stated reason at trial for objecting was that "the photo was available in 1992 and this is the first time that" it was shown to Diana.  We also note that, during his cross-examination of Diana, appellant himself introduced the 20-year-old photograph — State's exhibit 101 — into evidence without objection.

"The failure to complain or object in the trial court to in-court identifications waives any complaint regarding the in-court identifications on appeal." *Mason v. State*, 416 S.W.3d 720, 738 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd), *cert. denied*, *Mason v. Texas*, 135 S. Ct. 1181 (2015); *see Perry v. State*, 703 S.W.2d 668, 670-71, 673 (Tex. Crim. App. 1986).  Because appellant failed to raise this appellate contention in the trial court, his argument that the trial court erroneously allowed Diana to identify

45

him in-court by photograph and in person presents nothing for our review. Accordingly, we overrule appellant's first issue.

## II.    Sufficiency of the Evidence

In his second issue, appellant argues that his conviction is not supported by legally sufficient evidence because, aside from Diana's identification testimony, "the only remaining evidence to connect [appellant] to this offense is accomplice-witness testimony." According to appellant, "[t]he record carries no corroboration of Santana's accomplice-witness testimony beyond the identification testimony which the trial court reversibly erred in admitting."

### A.    Standard of Review and Applicable Law

A conviction cannot be secured upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant to the offense. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). Article 38.14 of the Code of Criminal Procedure provides as follows: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005); *Cerna v. State*, 441 S.W.3d 860, 864 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd). In analyzing a challenge to the sufficiency of corroborative evidence, we view the evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008).

To evaluate the sufficiency of corroboration evidence, we must eliminate all accomplice testimony from consideration and examine the remaining portions of the record to see if any evidence tends to connect the accused with the commission of the crime. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt; there need only

be other evidence tending to connect the defendant to the offense. *Id*. Testimony of an accomplice need be corroborated only as to facts "'tending to connect the defendant with the offense committed and not as to the corpus delicti itself.'" *Id*. (quoting *Gribble v. State*, 808 S.W.2d 65, 71 n.13 (Tex. Crim. App. 1990)).

The non-accomplice evidence need not link appellant directly to the crime or establish guilt beyond a reasonable doubt. *Id*.; *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). And the accomplice testimony need not be corroborated on every element of the offense. *Griffin v. State*, 936 S.W.2d 353, 357 (Tex. App.— Houston [14th Dist.] 1996, pet. ref'd). "There must simply be *some* non-accomplice evidence which tends to connect appellant to the commission of the offense alleged in the indictment." *Castillo*, 221 S.W.3d at 691 (emphasis in original).

When there are two permissible views of the evidence, one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense, appellate courts should defer to that view of the evidence chosen by the factfinder. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). The issue is not how an appellate court independently would assess the non-accomplice evidence, but whether a rational factfinder could conclude that the non-accomplice evidence tends to connect the accused to the offense. *Id*. at 509. Direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Each case must be judged on its own facts, and there is no set amount of non-accomplice corroboration evidence that is required. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient

corroboration to support a conviction. *Id.* But the presence of a defendant at the scene of a crime, by itself, is insufficient to corroborate accomplice testimony. *Id.* Therefore, we "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Smith*, 332 S.W.3d at 442.

Appellant was charged by indictment with the offense of capital murder. The jury was instructed to determine whether appellant, while in the course of committing or attempting to commit the (1) kidnapping of Angelo Garcia, Jr.; or (2) burglary of a building owned by Diana, intentionally caused the death of Angelo Garcia, Jr.

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2011). A person commits the offense of capital murder if the person commits murder as defined in Texas Penal Code section 19.02(b)(1) and the person intentionally commits the murder in the course of committing or attempting to commit kidnapping or burglary. Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2014).

## B.    Sufficiency of Corroborating Evidence

On appeal, appellant contends that there is legally insufficient evidence to support his conviction because Santana's accomplice witness testimony was not sufficiently corroborated. Appellant argues that, "aside from [Diana]'s [inadmissible] pre-trial identification and in-court identification of [appellant] and aside from the accomplice-witness testimony of" Santana, the record shows nothing more than appellant's general association with Cruz-Garcia and Santana, and appellant's presence at Cruz-Garcia's apartment a few days after Angelo's murder.

Contrary to appellant's assertion, the record contains sufficient evidence to corroborate Santana's accomplice testimony.[3]    In fact, Diana's identifications of

---

[3] The State does not dispute that Santana is an accomplice witness. The jury charge includes an instruction regarding accomplice witness testimony; it states that Santana is an accomplice witness.

appellant alone constitute sufficient corroborative evidence.

We note that appellant incorrectly asserts that Diana's identifications of appellant do not constitute corroborative evidence because they were inadmissible. First, we have already determined that the trial court properly allowed testimony regarding Diana's pre-trial identification of appellant's voice and Diana's in-court identification of appellant at trial. Second, appellant ignores the mandate that we consider "all evidence in the record of the trial, whether it was admissible or inadmissible" in conducting a sufficiency review. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)).

The testimony of a single eyewitness alone can be sufficient to support a conviction. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971); *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). Voice identification of a defendant may constitute a sufficient basis for a conviction. *See McInturf v. State*, 544 S.W.2d 417, 418-19 (Tex. Crim. App. 1976) (holding that voice identification based upon statements made during the commission of the offense was direct evidence identifying the defendant as the person who committed the crime); *see also Terrell v. State*, 766 S.W.2d 561, 564 (Tex. App.—Beaumont 1989, no pet.) (holding that "[v]oice identification is sufficient in and of itself to prove identity"); *Williams v. State*, 747 S.W.2d 812, 813 (Tex. App.—Dallas 1986, no pet.) (recognizing that voice identification based on statements made during a crime is sufficient to identify a defendant).

Here, Diana testified in detail about the events that occurred the night of September 30, 1992. She stated that a tall, husky, masked man broke into her small apartment and instructed Arturo to lie down on the side of the bed in their small bedroom while pointing a gun at Arturo. The man continued talking to Arturo and also told Diana to turn around and "lie flat on the bed." Diana testified that, after she laid

49

face-down on the bed, a pillow and a sheet were placed over her head. She testified that she could hear the man's voice in her small bedroom and she "very much" focused on the man's voice. The first man was the only one who spoke to her and Arturo that night; the second man who later entered the apartment and sexually assaulted her never spoke. Diana testified that she had described the first man's voice to Officer Hernandez in the early morning of October 1, 1992. She also testified that she had described the man as being a "6-foot or a little bit higher," "husky, well built," "dark complected" Hispanic man with "big, bulging, very white" eyes and "big, bubbly," "purple-ish" lips.

Diana positively identified appellant at trial as the first man who entered her apartment. She also testified that she positively identified appellant's voice pre-trial during a visit with Tise and Investigator Gillie. She testified that, when she heard a recording of appellant's voice, she started crying and said, "That's the voice of the man who came into my house, into my bedroom . . . . The only one that I saw that night . . . and the only one that was doing the talking." When Diana was asked why she identified appellant's voice, she stated: "I can still identify the voice if I hear the man. It's still in me. The voice is still inside me just the same as when I feel somebody hug me from my back. I still feel my son hugging me from my back. It's still inside my heart, inside my feelings. The voice is still in my head."

We conclude that Diana's testimony constitutes sufficient evidence to corroborate Santana's accomplice testimony. *See McInturf*, 544 S.W.2d at 418-19; *Aguilar*, 468 S.W.2d at 77; *Lee*, 176 S.W.3d at 458; *Terrell*, 766 S.W.2d at 564. Additionally, there is other non-accomplice evidence which tends to connect appellant to the commission of the capital murder of Angelo in this case.

At trial, Sergeant Swaim testified that, on October 6, 1992, he visited the apartment Cruz-Garcia and his wife had lived in before Cruz-Garcia fled Houston because Sergeant Swaim learned that a tall Hispanic male was staying at the apartment.

50

At the apartment, Sergeant Swaim was greeted by a tall Hispanic male who introduced himself as Candido Lebron. Sergeant Swaim testified that the man stated he was from St. Croix and gave Sergeant Swaim a St. Croix birth certificate with the name Candido Lebron. Investigator Swaim identified at trial State exhibit 84 as being a photo of the Hispanic male whom he encountered at Cruz-Garcia's apartment and who identified himself as Candido Lebron. Investigator Swaim testified that the photo was taken six days after Angelo was abducted. He also identified appellant in court as "an older version of the individual that [he] interviewed on that day."

Further, Investigator Gillie testified at trial that he traveled to Georgia to locate appellant after finding out appellant was involved in Angelo's murder. Investigator Gillie testified that he went to appellant's house and introduced himself but appellant did not "appear shocked" to see him. Appellant told Investigator Gillie that he knew "what this is about. It's about that little boy a long time ago in Houston."

After eliminating Santana's accomplice testimony from consideration and then examining the remaining portions of the record, we conclude that the record contains ample evidence that tends to connect appellant to the commission of the capital murder of Angelo. Accordingly, we overrule appellant's second issue.

## III. Court Costs

In his third issue, appellant contends that the judgment and bill of costs should be modified to delete several assessed costs because they constitute "a penalty as applied to" appellant and were not "orally pronounced as part of his sentence." Appellant contends that the Crime Stoppers Fee, Criminal Justice Planning Fee, Officer Education Fee, Crime Victims Compensation Fee, Judicial Training Fee, Jury Reimbursement Fee, Support of Indigent Defense Fee, and Court Technology Fee assessed against him are not compensatory costs but are punitive in nature because they do "not directly reimburse" or "compensate anyone associated with this case" and, thus, should have

51

been orally pronounced in court as part of his sentence to be valid. Appellant also argues that the Crime Stoppers Fee, Criminal Justice Planning Fee, Officer Education Fee, Crime Victims Compensation Fee, and Judicial Training Fee should not have been assessed because there is "no statutory authority for the court to assess this fee."

We begin by addressing appellant's contention that the Crime Stoppers Fee, Criminal Justice Planning Fee, Officer Education Fee, Crime Victims Compensation Fee, and Judicial Training Fee should be deleted as court costs because there is "no statutory authority for the court to assess this fee."

The bill of costs reflects court costs assessed in the amount of $417.50, including, as relevant to appellant's argument, a $20 Crime Stoppers Fee, a $2.00 Criminal Justice Planning Fee, a $3.50 Officer Education Fee, a $45 Crime Victims Compensation Fee, and $1 Judicial Training Fee. The trial court included $417.50 in court costs in its written judgment.

We have not found a statute that authorizes the individual assessment of these particular fees and amounts nor has the State pointed us to any statute authorizing the individual assessment. In fact, Texas Local Government Code section 133.102 indicates that the fees for crime stoppers, criminal justice planning, officer education, compensation to victims of crime, and judicial training are not to be individually assessed but are, instead, part of the mandatory $133 consolidated fee to be assessed "as a court cost" upon a felony conviction; and this consolidated court cost is to be remitted to the comptroller who is required to distribute it as mandated by section 103.102. *See* Tex. Loc. Gov't Code Ann. § 133.102 (Vernon Supp. 2014); *see also Owen v. State*, 352 S.W.3d 542, 548 (Tex. App.—Amarillo 2011, no pet.).

Therefore, we agree with appellant that there is "no statutory authority for the court to assess" an individual Crime Stoppers Fee, Criminal Justice Planning Fee, Officer Education Fee, Crime Victims Compensation Fee, and Judicial Training Fee as

set out in the bill of costs. Because these fees cannot individually be charged against appellant, the court costs assessed in the judgment thus have to be reduced by $71.50. Accordingly, we sustain appellant's third issue in this regard.[4]

We now turn to appellant's assertion that the Jury Reimbursement Fee, Support of Indigent Defense Fee, and Court Technology Fee assessed against him are not compensatory costs but are punitive in nature because they do "not directly reimburse" or "compensate anyone associated with this case" and, thus, should have been orally pronounced in court as part of his sentence to be valid.

The Court of Criminal Appeals has explained that "[c]ourt costs, as reflected in a certified bill of costs, need neither be orally pronounced nor incorporated by reference in the judgment to be effective." *Armstrong v. State*, 340 S.W.3d 759, 766 (Tex. Crim. App. 2011); *see Weir v. State*, 278 S.W.3d 364, 367 (Tex. Crim. App. 2009). "This is because court costs do not 'alter the range of punishment to which the defendant is subject, or the number of years assessed' and, thus, are not part of the sentence." *Armstrong*, 340 S.W.3d at 767 (quoting *Weir*, 278 S.W.3d at 367). Court costs are compensatory in nature because they are a nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of a case. *See Armstrong*, 340 S.W.3d at 767; *Weir*, 278 S.W.3d at 366. "In contrast, fines generally must be orally pronounced in the defendant's presence" because fines are punitive and intended to be part of the convicted defendant's sentence. *See Armstrong*, 340 S.W.3d at 767.

Additionally, there is no requirement that there be an individualized connection between each statutorily prescribed court cost and a particular case. *See Peraza v. State*, Nos. PD-0100-15 & PD-0101-15, 2015 WL 3988926, at *6-7 (Tex. Crim. App. July 1,

---

[4] We need not address appellant's additional argument that the assessed Crime Stoppers Fee, Criminal Justice Planning Fee, Officer Education Fee, Crime Victims Compensation Fee, and Judicial Training Fee also constitute a penalty because they do not reimburse or compensate anyone in this case.

2015).  "[C]ourt costs should be related to the recoupment of costs of judicial resources."  *Id*. at *6.  However, statutorily prescribed court cost need not be "necessary" or "incidental" to the trial of a criminal case; court costs must only be "expended for legitimate criminal justice purposes."  *Id*. at *7.

In this case, the bill of costs assessed a Jury Reimbursement Fee, Support of Indigent Defense Fee, and Court Technology Fee.  These fees are all statutorily mandated court costs.  *See* Tex. Code Crim. Proc. Ann. art. 102.0045 (Vernon Supp. 2014) (Jury Reimbursement Fee); Tex. Loc. Gov't Code Ann. § 133.107 (Vernon Supp. 2014) (Indigent Defense Fee); Tex. Code Crim. Proc. Ann. art. 102.0169 (Vernon Supp. 2014) (Court Technology Fee).  Because there is no requirement that these three statutorily imposed fees "directly compensate" or "reimburse anyone associated with this case," we overrule appellant's third issue in this regard.  *See Peraza*, 2015 WL 3988926, at *6-7.

## CONCLUSION

We modify the trial court's judgment to delete the amount of $71.50 from the total amount of $417.50 in assessed court costs.  As modified, we affirm the trial court's judgment.


/s/     William J. Boyce
        Justice



Panel consists of Chief Justice Frost and Justices Boyce and McCally.  (Frost, C.J., concurring).
Publish — Tex. R. App. P. 47.2(b).



In The

# Fourteenth Court of Appeals

### NO. 14-14-00142-CR

### ROGELIO AVILES-BARROSO, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause No. 1364839**

## C O N C U R R I N G   O P I N I O N

In determining whether a voice identification is reliable, binding precedent requires this court to consider the factors articulated in *Neil v. Biggers*.[1] These

---

[1] *See* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Williams v. State*, 850 S.W.2d 784, 786–87 (Tex. App.—Houston [14th Dist.] 1993) (holding that indicia of reliability in a voice identification include the witness's opportunity to hear, the degree of attention, the accuracy of the description, the level of certainty, and the time between the event and the confrontation), *aff'd on other grounds by*, 895 S.W.2d 363 (Tex. Crim. App. 1994).

factors are: (1) the witness's opportunity to hear the speaker at the time of the event, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the speaker's voice, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the event and the confrontation.[2]  Applying these factors in a *Biggers* analysis, the majority concludes that Diana's voice identification is reliable.  The precedent applying the *Biggers* test supports that result.  Because we are bound to apply the *Biggers* test, I concur in the court's judgment, but I write separately to suggest that it is time for courts to reconsider the *Biggers* factors as applied to voice identification.

In the forty-three years since the Supreme Court of the United States articulated the *Biggers* factors, scientists have been studying whether these factors accurately predict the reliability of a witness's identification.  The findings raise concerns.  Studies are ongoing, but the research results in hand tend to undercut confidence that the *Biggers* factors are truly indicia of reliability.  The scientific literature suggests that though some of the *Biggers* factors relate to the reliability of a witness's identification, others do not.  Empirical research seems to be revealing that some of the factors may not be good indicators of reliability.

Not surprisingly, scientists have confirmed that the opportunity to view or hear a suspect and the length of time between the event and the confrontation affect the reliability of a witness's identification.[3]  But, unexpectedly, some research has shown that a witness's confidence in the identification does not impact reliability.[4]  Likewise, some research seems to show that the relationship

---

[2] *See Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382.

[3] *See* Cindy E. Laub et al., *Can the Courts Tell an Ear from an Eye?  Legal Approaches to Voice Identification Evidence*, 37 LAW & PSYCHOL. REV. 119, 123 (2013).

[4] Laub, *supra* note 3, at 124 & 142; Jason A. Cantone, *Do you Hear What I Hear?*, 17

2

between the characteristics of the witness's verbal description of an individual and the characteristics of the person identified does not affect reliability.[5] If the research results are valid, the lack of correlation undermines the validity of these *Biggers* factors.

Questions about the efficacy of the *Biggers* test are more pronounced in the context of a voice identification like the identification Diana made in today's case.[6] Research indicates that vocal identifications are less accurate than eyewitness identifications, potentially because the human brain processes faces for later recognition and speech for meaning.[7] The fundamental differences between the way the human brain processes faces and the way the human brain processes speech may mean there are differences between the factors that indicate a reliable visual identification and those that indicate a reliable vocal identification.[8]

Researchers have suggested, for example, that while a witness's opportunity to hear the speaker at the time of the event is important to the reliability of a voice identification just as the opportunity to view the actor's face is important to a visual identification, the accuracy of a voice identification also depends on similarities between the voice at the time of the event and the voice at the time of identification.[9] Research shows that an earwitness's accuracy in identifying a voice increases when the tone and emotion in the identified voice sample match the tone and emotion of the voice during the event.[10] Similarly, while research

---

TEX. WESLEYAN L. REV. 123, 130–31 (2011).

[5] *See* Laub, *supra* note 4, at 124.

[6] *See id.* at 120.

[7] *Id.* at 124–25.

[8] *See id.* at 123.

[9] *See id.*

[10] *See* Cantone, *supra* note 3, at 128.

suggests the length of time between hearing the voice and identifying it affects a witness's accuracy just as the length of time between the event and a witness's visual identification affects accuracy, the effect of the length of the retention interval is different in vocal identifications.[11] Researchers have suggested that with unfamiliar voices, vocal identifications can deteriorate significantly within weeks of the event.[12] In one study, subjects asked to recall a voice had only a nine percent accuracy rate after three weeks.[13] It seems that the "reliability" window with respect to the interval between the event and the confrontation may be much narrower for voice identification.

Cross-lingual voice identification triggers additional concerns because this species of voice identification implicates additional considerations. Although existing studies appear to be somewhat in conflict, some research suggests that people are more likely to hear the voices of speakers in a foreign or accented language as homogeneous or similar, but are able to perceive diversity or distinctive forms of speech among speakers of their own regional area.[14] Anecdotally speaking, native Texans might easily distinguish among the voices of other native Texans but might have difficulty distinguishing among speakers with a Boston accent based on voice alone. Researchers and academicians alike warn of the dangers inherent in cross-lingual voice identification.[15]

Though appellant's expert witnesses discussed some of these considerations

---

[11] Laub, *supra* note 3, at 124.

[12] *See* Cantone, *supra* note 3, at 130; A. Daniel Yarmey, *Earwitness Speaker Identification*, 1 PSYCHOL. PUB. POL'Y & L. 792, 805 (1995).

[13] Cantone, *supra* note 3, at 130; Yarmey, *supra* note 11, at 805.

[14] *See* Yarmey, *supra* note 11, at 798.

[15] *See* Gary Edmond et al., *'Mere Guesswork': Cross-Lingual Voice Comparisons and the Jury*, 33 SYDNEY L. REV. 395, 405–08 (2011).

during the motion-to-suppress hearing, appellant did not fully develop the potential problems in Diana's voice identification. Appellant cross-examined investigator Kerry Gillie about the twenty-year gap between the event and the confrontation, and Dr. Philip Lyons noted that there are difficulties identifying a speaker who spoke Spanish with a different dialect. Dr. Lyons testified, however, that he was unaware of any studies that looked at dialects rather than identifying speakers of foreign languages. In fairness, these are emerging issues in science as well as law. The empirical research and scholarship are still developing, and the law may not be keeping pace with the science.

Given the changing landscape, we must continue to ask whether the *Biggers* factors are the best measure of reliability for voice identification. What is clear from both scientific research and human experience is that familiarity plays a big role in reliable voice identification. So, when the voice being identified is an unfamiliar one, greater scrutiny is required for reliable voice identification, and greater scrutiny still when an earwitness is not familiar with either the speaker's voice or the speaker's dialect. Given the unfolding research in cross-lingual voice identification, we should question whether these elements should be given greater weight in a *Biggers* analysis and whether additional enumerated factors should be added to the *Biggers* test when it is applied to voice identification.

To ensure fair proceedings, courts should take these considerations into account in making reliability determinations, especially when the identification is based on voice alone, unaccompanied by visual or other forms of identification. Though the witness in today's case did not get a look at the speaker's entire face during the criminal episode, the witness was able to recall and identify facial features. Diana's recognition of appellant's facial features, though not powerful visual-identification evidence, strengthens, to some degree, the identification.

The gaps in science and law, known and unknown, tell us that the *Biggers* test may be falling short as a measure of reliability for voice identification. Now is the time to consider what steps can be taken to improve reliability testing in voice-identification cases.

Even though the scientific literature calls into question the validity of the *Biggers* factors, this court is bound to consider them.[16] Appellant did present limited testimony about a witness's inability to remember a voice over time. But, the record also reveals the witness had an opportunity to hear the speaker's voice during the criminal episode and was keenly focused on his voice; the witness provided a description of the Spanish dialect she detected in the speaker's voice; and she displayed unshakeable confidence in her identification. Under the precedent applying the *Biggers* test, these four factors support the trial court's admission of the identification evidence.[17] So, the result the majority reaches applying the *Biggers* test is sustainable under current law as is the majority's conclusion that the trial court did not err in admitting the witness's voice identification into evidence, based on the evidence presented to the trial court. For this reason, I respectfully concur in the judgment.


/s/  Kem Thompson Frost
     Chief Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally. (Boyce, J., Majority).
Publish — TEX. R. APP. P. 47.2(b).

---

[16] *See Williams*, 850 S.W.2d at 786–87.

[17] *See Davis v. State*, 180 S.W.3d 277, 283–85 (Tex. App.—Texarkana 2005, no pet.).

6