**Affirmed and Memorandum Opinion filed April 21, 2020.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-18-00816-CR

**BYRON DEMONTA COLEMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 17-DCR-076513**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Byron Demonta Coleman guilty of capital murder. In a single issue, Appellant asserts the trial court erred in denying his motion to suppress a witness's pretrial photographic identification. For the reasons below, we affirm.

### BACKGROUND

Complainant Nerbert Frelow was shot to death in his parked vehicle on the

afternoon of December 24, 2016. Jada Johnson, a passenger in Complainant's vehicle, witnessed the shooting. Giving a statement to police later that afternoon, Johnson said she could identify the three individuals involved in Complainant's death.

After investigating the shooting, Detective Crowder compiled photo arrays for Johnson to see if she could identify any of the suspects as the individuals involved in Complainant's death. One of the photo arrays contained Appellant's picture along with pictures of five other men. This photo array was shown to Johnson at her residence on January 20, 2017. Johnson "pretty quickly" identified Appellant as the person who shot Complainant. Johnson also wrote out the physical characteristics that supported her identification.

Appellant was arrested and charged with murder. Appellant moved to suppress Johnson's pretrial photographic identification and the trial court held a hearing. After hearing testimony from Johnson and Detective Crowder, the trial court overruled Appellant's motion. Testimony regarding Johnson's identification and the photo array containing Johnson's notes were admitted at Appellant's trial.

The jury found Appellant guilty of capital murder. Appellant was automatically sentenced to life imprisonment with the possibility of parole. *See* Tex. Penal Code Ann. § 12.31(a)(1). Appellant timely appealed.

## ANALYSIS

Appellant asserts the trial court erred by denying his motion to suppress Johnson's pretrial photographic identification.

## I. Standard of Review and Governing Law

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011);

2

*August v. State*, 588 S.W.3d 704, 710 (Tex. App.—Houston [14th Dist.] 2019, no pet.). We use a bifurcated standard of review, giving almost total deference to a trial court's determination of historical facts and mixed questions of law and fact that turn on the credibility of a witness; we apply a *de novo* standard to questions of law and mixed questions that do not depend on credibility determinations. *Martinez*, 348 S.W.3d at 922-23; *Zuniga-Hernandez v. State*, 473 S.W.3d 845, 848 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

We view the evidence in the light most favorable to the trial court's ruling. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *August*, 588 S.W.3d at 710. In a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Zuniga-Hernandez*, 473 S.W.3d at 848. We uphold the trial court's ruling if it is reasonably supported by the record and correct under any theory of law applicable to the case. *August*, 588 S.W.3d at 710.

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that using the identification at trial would deny the accused due process of law. *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001); *Fisher v. State*, 525 S.W.3d 759, 762 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). We apply a two-step analysis to determine the admissibility of a pretrial identification: (1) whether the out-of-court identification procedure was impermissibly suggestive, and (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Fisher*, 525 S.W.3d at 762. This analysis requires an examination of the totality of the circumstances surrounding the particular case. *Conner*, 67 S.W.3d at 200; *Fisher*, 525 S.W.3d at 762. The burden is on the defendant to prove both prongs by clear and convincing evidence.

*Aviles-Barroso v. State*, 477 S.W.3d 363, 381 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

With respect to the first prong, suggestiveness may result from the manner in which the pretrial identification procedure was conducted; the content of the photo array; or the cumulative effect of the procedures and photographs used. *Fisher*, 525 S.W.3d at 762 (citing *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995)). All photo arrays must contain photographs of individuals who roughly fit the description of the suspect. *Id.* at 762-63.

For the second prong, we assess the reliability of the identification by weighing five non-exclusive factors against the corrupting effect of any suggestive identification procedures: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification. *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016); *Fisher*, 525 S.W.3d at 763.[1]

## II.    Evidence

Testifying at the suppression hearing, Johnson described the events preceding the shooting. Johnson said she was sitting in the front passenger seat of Complainant's car, which was "backed in by the park." According to Johnson, it was around 2:00 or 3:00 p.m. when she and Complainant were approached by three men who Johnson had not previously met. Johnson testified that Complainant stepped out of the vehicle and had a conversation with the three men for "a good

---

[1] *Balderas* and *Fisher* use the word "confrontation" (instead of "identification") in their description of elements 4 and 5, but in both cases the court was reviewing an identification the witness made from a photo array (as here). "Identification" is the more specific and appropriate term.

4

25, 30 minutes." While the men were conversing, Johnson said she would alternate between looking at the men and just generally taking in her surroundings. Johnson said she was not "doing anything else" while sitting in the car. When asked if she had been looking at her phone during the encounter, Johnson replied "[n]o" and said she "didn't have a phone."

Johnson said she "duck[ed] down on the — under the dashboard" when one of the men pointed a gun at her. Johnson said she "kept looking up" to check on Complainant because he was "out there by himself." According to Johnson, she was "able to see who shot [Complainant] after that point." After the shooting started, Johnson said she "climbed into the [car's] back and got on the floor" and stayed there for about five minutes before leaving the car to get help.

Johnson said she gave the police a description of the three men and the clothes they were wearing. According to Johnson, she told the police she "thought [she] could identify those three males" that Complainant had been talking to when he was shot. When the State's attorney asked Johnson to describe the men "in general terms", Johnson stated: "One was younger than both of them. Another one was dark, darker than both of them. And then another one was light-skinned." Johnson described the men's clothes as follows:

> One of them had on basketball shorts and a black shirt. And then the other had on a gray shirt and — I think with some sweats. And the little guy had on a jacket, but I can't remember what kind of bottoms he had on.

When the detectives arrived at her house with the photo array, Johnson said they instructed her to take her time and told her that the person from the shooting may not be in the photos. Johnson said she was "very certain" regarding her identification of Appellant as the person who shot Complainant.

Detective Crowder said he initially met Johnson at the crime scene the day

5

of the shooting. Detective Crowder said Johnson provided the following description of the men:

> She described them — one of them as a brown-skinned black male, looked real young, as — like he was 16 years old, wearing a black hoodie or a black shirt and a small afro.
>
> One of them was a darker-colored male who was sort of fat, wearing a gray or black shirt, and a low-fade haircut.
>
> Light-skinned male wearing a gray shirt was the third individual.

Detective Crowder said he created the photo array using a computer program to "pull up individuals in our database with similar physical characteristics" to those of Appellant. When asked about the level of human interaction necessary for this process, Detective Crowder said the person preparing the array can "decide which photos should stay and which should go." Detective Crowder said he selected five other individuals and the computer "randomize[d] them on the actual array." The five other individuals included on Appellant's photo array have appearances similar to Appellant's.

Detective Crowder testified that he and Detective Benegrado arrived at Johnson's house on January 20, 2017, to show her the photo array. Detective Crowder said Johnson was verbally admonished before presentment of the photo array; these admonitions were not given to her in writing. Detective Crowder testified that the person who prepared the array could not be the same person that presented the array to the witness, so Detective Benegrado presented the array to Johnson. Detective Benegrado did not look at the array before presenting it to Johnson. According to Detective Crowder, the photo array was in a manila envelope and Johnson was instructed to open the array for her view only. If she was able to make a selection, Johnson was instructed to circle the photograph, initial it, and write out any comments or characteristics supporting her

6

identification.

Detective Crowder testified that Johnson identified Appellant "pretty quickly", had a "strong emotional response", and "began crying." Johnson circled Appellant's picture and wrote down the following notes: "his face"; "his eyes"; "his skin color"; "his lips"; and "I believe that he is the shooter." According to Detective Crowder, Johnson said "she was 100 percent sure that [Appellant] was the shooter."

## III.    Analysis

In his brief, Appellant does not direct any argument to the first prong of the applicable analysis, *i.e.*, whether the identification procedure was impermissibly suggestive. *See Fisher*, 525 S.W.3d at 762. Appellant confines his argument to the second prong of the analysis and asserts Johnson's identification was not reliable. *See id*.

Beginning with the first prong, our review of the record does not indicate the identification procedure at issue here was impermissibly suggestive. Detective Crowder testified that the photo array was generated using a computer program and he selected five individuals with appearances similar to Appellant's. Detective Crowder said the computer program randomized the order in which the pictures were placed in the array. The photo array was presented to Johnson by Detective Benegrado, who did not participate in its creation, did not look at it, and did not know where in the array Appellant's picture was located. Detective Crowder and Johnson testified that Johnson was admonished before presentment of the array. Johnson was instructed to take her time and, if she could make an identification, circle the picture and write out any comments or characteristics supporting her determination. Considered altogether, this evidence does not show that the photo array or the manner in which the identification procedure was conducted were

7

suggestive.

Even presuming that the identification procedure was impermissibly suggestive, the record does not show a substantial likelihood that Johnson misidentified Appellant. According to Johnson, the shooting occurred on a sunny afternoon; Johnson said Complainant stood outside the car for 25-30 minutes conversing with the men before he was shot. Johnson said she alternated between looking at the men and looking at her other surroundings. Johnson said she was not "doing anything else" while sitting in the car. After the shooting, Johnson provided a description of the men and their clothing and said she could identify them. Johnson was "very certain" regarding her identification of Appellant and, on Appellant's photograph, wrote that her identification was supported by Appellant's face, eyes, skin color, and lips. According to Detective Crowder, Johnson had a "strong emotional response" and "began crying" when she saw Appellant's picture.

Asserting that Johnson's identification is not reliable, Appellant argues that Johnson's "degree of attention [wa]s called into question" because Johnson said she "would look off" while Complainant was conversing with the three men. Appellant also asserts that Johnson did not "have sufficient time to view the criminal act at the time of the crime" because Johnson said she "duck[ed]" under the dashboard when the shooting started.

But this evidence does not show a substantial likelihood that Johnson's identification was in error. Johnson said that while Complainant and the three men conversed for 25-30 minutes, she would alternate between looking at the men and just generally taking in her surroundings. Johnson said she was not doing anything else while she was sitting in the car. That Johnson occasionally looked away during the encounter and "duck[ed]" under the dashboard only after the gun was pointed at her does not negate the time she spent observing the men. Johnson also

8

stated that she was able to see who shot Complainant after she ducked under the dashboard, suggesting that she was still able to view the incident. Further supporting the reliability of her identification, Johnson provided a description of the men and their clothing to the police; stated that she would be able to identify the men; was confident in her identification of Appellant as the shooter; and listed several of Appellant's facial features that supported her identification. Considering this evidence in the light most favorable to the trial court's ruling, the evidence does not support the conclusion that Johnson misidentified Appellant.

We overrule Appellant's issue on appeal.

## CONCLUSION

We affirm the trial court's final judgment.

/s/     Meagan Hassan
            Justice

Panel consists of Justices Bourliot, Hassan, and Poissant.

Publish — Tex. R. App. P. 47.2(b).